**HORIZON/CMS HEALTHCARE COR-
PORATION d/b/a Heritage Western
Hills Nursing Home, Petitioner,**

v.

**Lexa AULD, administratrix of
the Estate of Martha Hary,
deceased, Respondent.**

No. 99–0169.

Supreme Court of Texas.

Decided Aug. 24, 2000.

Argued Nov. 17, 1999.

Michelle E. Robberson, Diana L. Faust, R. Brent Cooper, Cooper & Scully, Ira Thomas King, Laura L. Frey, Dallas, for petitioner.

H. Dustin Fillmore, Fillmore Law Firm, Fort Worth, Dana C. Livingston Cobb, Cook Roach & Lawless, Austin, H. Dustin Fillmore, III, Charles W. Fillmore, Fillmore Law Firm, Fort Worth, for respondent.

Justice ABBOTT delivered the opinion of the Court, in which Justice HECHT, Justice ENOCH, Justice OWEN, and Justice GONZALES join.

The focus of this case is whether Texas Revised Civil Statutes article 4590i, section 11.02(a) (part of the Medical Liability and Insurance Improvement Act), or Texas Civil Practice and Remedies Code section 41.007, provides a statutory basis for capping punitive damages that are awarded in cases involving health-care-liability claims. We hold that the latter provision, section 41.007, provides the basis for capping the punitive damages that were awarded in this case, and that article 4590i, section 11.02(a), does not. We also hold that article 4590i, section 11.02 does, however, cap the amount of prejudgment interest awarded on Auld's actual damages falling within section 11.02(a)'s cap. As a result, Auld is not entitled to the entire prejudgment interest award in this case. Other issues raised by the parties include the constitutionality of article 4590i, section 11.02, and evidentiary and procedural concerns. We agree with the court of appeals' judgment on these matters. Accordingly, we affirm the court of appeals' judgment in part. With regard to that portion of the judgment affirming the trial court's award of prejudgment interest to Auld, we hold that Auld may recover prejudgment interest awarded on the damages specifically excluded from article 4590i's damages cap by section 11.02(b), but that Auld may recover prejudgment interest on damages subject to the cap only to the extent that such interest does not exceed the cap. Accordingly, we reverse in part and remand to the trial court to render judgment in accordance with this opinion.

I

Martha Hary became a resident at Heritage Western Hills Nursing Home (Heritage) in August 1994. When she arrived at Heritage, Hary suffered from, among other things, Alzheimer's disease, anxiety, malnutrition, emphysema, and spinal arthritis. She resided at Heritage for about one year before she was hospitalized in Fort Worth, where she was treated for ten days. After her hospitalization, Hary was transferred to a different nursing home that is not a party to this suit.

Through her next friend Francis Orr, Hary filed suit against Horizon/CMS Healthcare Corporation (Horizon) alleging that its nursing home—Heritage—was

negligent and grossly negligent by failing to provide her with medical care and treatment within the acceptable standard of care. Hary alleged that substandard nursing care proximately caused her to develop pressure sores, that she suffered from contractures in all extremities, that not all the wound-care treatments and pressure-relieving devices that had been ordered were provided to her, and that the care actually administered for her pressure sores was painful. While the case was pending, Hary died from a heart attack. Hary's administratrix, Lexa Auld, continued the suit through a survival action, which was tried to a jury.

The jury returned a verdict of $2,371,000 in actual damages, which included $1,750,000 for physical pain and mental anguish, $150,000 for disfigurement, $250,000 for impairment, and $221,000 [1] for medical care. The jury also awarded $90,000,000 in punitive damages, based on its finding that the nursing home engaged in grossly negligent conduct toward Hary. The trial court reduced both the actual and punitive damages awards. The court applied the article 4590i cap to the actual damages award and reduced it to $1,541,203.13, which represented the capped limit, adjusted for changes in the consumer price index,[2] plus medical expenses, which the statute specifically excludes from the cap. *See* TEX.REV.CIV. STAT. art. 4590i, §§ 11.02(a),(b), 11.04.

The court also reduced the punitive damages award from $90,000,000 to $9,483,766.92, based on the statutory cap on punitive damages awarded in personal injury suits found in Texas Civil Practices and Remedies Code section 41.007. This reduction was based on the version of the Texas Civil Practice and Remedies Code cap applicable at the time Hary's cause of action accrued. It provided that "exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, sec. 41.007, 1987 Tex. Gen. Laws 37, 46, *amended and renumbered by* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111 (current version at TEX. CIV. PRAC. & REM.CODE § 41.008). Using this formula, the court multiplied the jury's uncapped actual damages award[3] by four to calculate the punitive damage total of $9,483,766.92.[4] The trial court further awarded prejudgment interest on the capped actual damages at the rate of ten percent per annum, totaling $211,968.21. Both parties appealed. The court of appeals affirmed, finding no reversible error. 985 S.W.2d 216. We affirm all parts of the court of appeals' judgment, except for the award of prejudgment interest on the capped amount of actual damages.

## II

### Punitive Damages

■ The court of appeals held that punitive damages awards in health-care-lia-

---

1. Although the evidence with regard to medical expenses indicated $220,941.73 in damages, the jury awarded $221,000. The trial court reduced the judgment accordingly.

2. The statute requires an adjustment of the $500,000 cap listed in the statute to reflect changes in the consumer price index. *See* TEX.REV.CIV. STAT. art. 4590i, § 11.04. At the time of judgment in this case, the adjusted cap was $1,320,261.40.

3. Neither party challenges the trial court's use of the uncapped actual damages, rather than the capped actual damages, as the multiplier in this case.

4. The court of appeals opinion explains how the trial court arrived at the final punitive damages figure:

 To reduce the jury's $90,000,000 exemplary damages finding under the 1994 version of section 41.007 of the civil practice and remedies code, the trial court quadrupled the jury's *uncapped* finding of actual damages ($2,371,941.71 corrected). Although *de minimis*, we notice that four times $2,370,941.71 = $9,483,766.84, not the $9,483,766.92 figure recited in the judgment.
 985 S.W.2d at 221 n. 3.

bility claims are not capped by article 4590i, section 11.02(a). 985 S.W.2d at 224. Instead, the court of appeals affirmed the trial court's application of the punitive damages cap found in Texas Civil Practice and Remedies Code section 41.007. *Id.* at 224, 234.

## A

## Article 4590i

Texas Revised Civil Statute article 4590i, section 11.02 provides:

(a) In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

(b) Subsection (a) of this section does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

Tex.Rev.Civ. Stat. art. 4590i, § 11.02(a),(b). Horizon argues that article 4590i should cap punitive damages in this case because the phrase "civil liability for damages" necessarily includes all obligations to pay damages in a civil case, without distinction between actual damages and punitive damages. Horizon focuses on the Legislature's specific exclusion of certain types of medical expenses from section 11.02(a)'s application. Auld contends the opposite—that punitive damages are not capped under article 4590i because the term "damages," as used in the statute, means "compensation for injury or loss," which would not include punitive damages.

 This Court's ultimate goal in construing a statute is to give effect to the Legislature's intent as expressed in the language of the statute. *See Crimmins v. Lowry,* 691 S.W.2d 582, 584 (Tex.1985). Article 4590i does not define "damages." It does, however, provide that "[a]ny legal term or word of art used in this part, not otherwise defined in this part, shall have such meaning as is consistent with the common law." *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(b). After exploring the common law to ascertain the common-law meaning of "civil liability for damages," we reach the conclusion that the common law provides no meaningful guidance regarding whether punitive damages should be included in a common-law definition of "civil liability for damages." *Compare, e.g., City of Dallas v. Cox,* 793 S.W.2d 701, 733 (Tex.App.-Dallas 1990, no writ) (citing *McRae v. Lindale Indep. Sch. Dist.,* 450 S.W.2d 118, 124 (Tex.Civ.App.-Tyler 1970, writ ref'd n.r.e.), which defines the term "damages" as "the sum of money the law awards as pecuniary compensation, recompense, or satisfaction for an injury done or a wrong sustained as a consequence of either a breach of a contractual obligation or a tortious act"); *and Dalby v. Lyle,* 105 S.W.2d 764, 766 (Tex.Civ.App.-Amarillo 1937, no writ) (*"Damages* are compensation for loss ....") *with Azar Nut Co. v. Caille,* 734 S.W.2d 667, 668–69 (Tex.1987) (affirming the court of appeals' conclusion that the term "damages," as used in the retaliatory-discharge provision of the workers' compensation statute, included punitive damages); *American Home Assurance Co. v. Safway Steel Prods. Co.,* 743 S.W.2d 693, 701–02 (Tex.App.-Austin 1987, writ denied) (interpreting two insurance policies that obligated an insurer to pay all sums the insured became legally obligated to pay as damages to encompass both actual and punitive damages); *Castleberry v. Frost–Johnson Lumber Co.,* 283 S.W. 141, 142 (Tex. Comm'n App.1926, judgm't adopted) (holding that "the word 'damages,' unless limited, as is not done [in the Workmen's Compensation Act,] covers exemplary as well as actual damages"). Nevertheless, any ambiguity concerning the scope of the meaning of "civil liability for damages" is clarified by the statute's legislative history.

Horizon and amici curiae [5] in support of Horizon's position argue that the statute's legislative history evinces a legislative intent to include both punitive and compensatory damages within article 4590i's cap, primarily focusing on the specific exclusion of certain damages in section 11.02(b). On the other hand, Auld and supporting amici curiae [6] assert that article 4590i's legislative history demonstrates the Legislature's intent not to include punitive damages within the cap. We agree with Auld that article 4590i's legislative history indicates that the Legislature did not intend to include punitive damages within article 4590i's cap.

The Legislature enacted article 4590i with the express recognition that Texas faced "a serious public problem in availability of and affordability of adequate medical professional liability insurance," which in turn had "a material adverse effect on the delivery of medical and health care in Texas." TEX.REV.CIV. STAT. art. 4590i, § 1.02(a)(4), (6). The Legislature determined that the lack of affordable professional liability insurance was due to the frequency and severity of recent health-care-liability claims. *See id.* § 1.02(a)(1), (3), and (5). In addressing this problem, the Legislature capped the amount of damages a physician or health-care provider could be required to pay. *See id.* § 11.02. The underlying theory was that a medical-liability insurer could offer lower malpractice rates, which, in turn, would increase the availability of medical care for Texans.

Additional support for this legislative intent is derived from the Medical Professional Liability Study Commission's findings, which were expressly adopted by the Legislature in article 4590i. *See id.* § 1.02(a)(13). While discussing the "damages" at the root of the health-care crisis that prompted the Legislature to enact article 4590i, the Commission addressed compensatory, but not punitive, damages:

> In general those who suffer personal injury as a consequence of the negligence of another can recover two general kinds of damages: first, damages for non-economic losses that go by the name of physical pain and mental suffering; second, economic losses, such as expenses and loss of earnings. The Study Commission has for convenience lumped damages into three categories: (1) pain and suffering, (2) expenses, and (3) loss of earnings.

TEXAS MEDICAL PROFESSIONAL LIABILITY STUDY COMMISSION, FINAL REPORT TO THE 65th LEGISLATURE 5 (Dec.1976). This definition of damages makes no mention of punitive damages. Moreover, none of the report's recommendations mentions punitive damages, except for recommending that insurance carriers be restricted from covering punitive damages. Because the Commission's definition of punitive damages does not reference punitive damages awards and the Commission's findings were expressly adopted by the Legislature, it is unlikely that this same Legislature would have intended "damages" to mean something other than what the Commission envisioned. If it intended otherwise, the Legislature provided no indication of that intent.

Even the Texas Medical Association (TMA), one of the leading proponents of article 4590i, has repeatedly stated that the cap in article 4590i, section 11.02(a), does not include punitive damages. The

---

**5.** The following amici curiae filed briefs in support of Horizon: Columbia/HCA Healthcare Corp.; Texas Health Resources; Charter Behavioral Health Systems, Inc.; Texas Health Care Association; Texas Association of Homes for the Aging; Southwest Risk Advisors, LLC; and the Texas Medical Association.

**6.** The following amici curiae filed briefs in support of Auld: Victims of HMO Medical Negligence; United People for Better Nursing Home Care; American Jewish Congress; American Association of Retired Persons; Texas Advocates for Nursing Home Residents; and State Representative Tom Uher, former State Senator A.R. Schwartz, and former State Representative Don Henderson.

final version of article 4590i that the Legislature passed, House Bill 1048, was a compromise measure between two companion bills, Senate Bill 103 and House Bill 370. *See* Tex. H.B. 1048, 65th Leg., R.S. (1977), Tex. S.B. 103, 65th Leg., R.S. (1977) & Tex. H.B. 370, 65th Leg., R.S. (1977). The cap on damages was taken from these two companion bills, and most of the testimony relating to the cap occurred during the hearings on these bills. In support of these two bills, the TMA submitted its own report discussing the findings and recommendations of the Commission. The TMA's report, like the Commission's report, did not mention punitive damages as a cause of the insurance crisis. *See generally* TEX. MED. ASS'N, REPORT ON THE MALPRACTICE INSURANCE CRISIS (1977). If the TMA desired punitive damages awards to be included in the cap, it certainly provided no hint of that desire.

Furthermore, Senate Bill 103 was referred to the Senate Jurisprudence Committee, where it was considered in a public hearing. At the hearing, a TMA representative, Jack Maroney, testified regarding the specifics of the proposed $500,000 cap, stating that "noneconomic losses, commonly denominated as pain and suffering[,]" would be capped at $100,000[7] and that "the total award" would be capped at $500,000 "except for future medical." Hearings on Tex. S.B. 103 Before the Senate Jurisprudence Comm., 65th Leg., R.S. (Feb. 9, 1977) (testimony of Jack Maroney). Maroney followed with an example of how these caps would operate:

> Assuming that a jury awarded eight hundred thousand dollars, including a hundred thousand limitation on the pain and suffering, four hundred for economic losses, a hundred and fifty for past medical and a hundred and fifty thousand for future medical, that plaintiff would be entitled to receive six hundred and fifty thousand dollars.

*Id.* And, in defining the "total award," he testified:

> I would like to call your attention to the fact that four hundred thousand dollars of economic award placed in a savings and loan or in a C.D. would realize some twenty five to thirty thousand dollars a year without invading the corpus. And I submit to you that this protects the very large, large percent of the population of this state.

*Id.* At no time did Maroney mention punitive damages. Although the TMA did not endorse the final version of the bill,[8] House Bill 1048 borrowed the $500,000 cap directly from the TMA-backed companion bills discussed above, and the legislative history of those two bills contains no reference to punitive damages, much less any reference to including punitive damages in the cap.

When the constitutionality of the cap was later questioned, the TMA attempted to obtain a constitutional amendment to make the article 4590i cap constitutional and increase its limit from $500,000 to $1 million. *See TMA Postpones Push for Medical Liability Legislation,* TMA ACTION, July/Aug.1987, at 1. Representative Brad Wright, who sponsored the amendment, stated that the $1 million limitation is "$1 million, ... plus medical care, plus hospital care, plus custodial care. It's $1 million, plus all that care, *plus punitive damages. The limitation will not be a limitation on punitive damages.* [The amendment is] not [an] innovative piece[ ]

---

7. This subcap was part of an amendment to Senate Bill 103 that did not become part of the final version of the bill. In discussing this subcap, the sponsor of this proposed amendment conceded that the subcap was arbitrary but observed that "[i]n addition to [pain and suffering], the jury can award [damages] *for lost wages and other economic type losses* for a total of five hundred thousand or a half-million dollars." Debate on Tex. H.B. 1048 on

the Floor of the Senate, 65th Leg., R.S. (Apr. 18, 1977) (statement of Senator Farabee) (emphasis added).

8. The TMA objected to the final version because the bill did not include provisions abrogating the collateral-source rule and providing for periodic rather than lump-sum payments of judgments.

of legislation. [It is] not visionary. [It's] simply an attempt to validate *what we did ten years ago.*" Hearings on Tex. H.J.R. 3 & H.B. 5 Before the House Comm. on State Affairs, 70[th] Leg., 2[nd] C.S. (June 29, 1987) (statement of Rep. Wright) (emphasis added). Given the TMA's role as active proponent of article 4590i's cap, the TMA's statements and those of its bill sponsor provide revealing insight that even the statute's proponents did not expect the article 4590i cap to include punitive damages. It is noteworthy that in its amicus brief filed in this case, the Texas Medical Association did not disavow any of the statements that have been attributed to it.

■ Despite this legislative history, Horizon and its supporting amici curiae, including the TMA, contend that the Legislature implicitly included punitive damages in the cap by failing to include them in section 11.02(b)'s specific exclusion of certain damages. But this reliance on section 11.02(b) is misplaced. The Legislature's exclusion of certain types of compensatory damages from the cap does not give rise to an inference that the Legislature intended to include punitive damages within the cap. Not only does the foregoing legislative history refute this inference, but section 11.02(b)'s exclusion of certain medical expenses from the cap also gives rise to a much narrower inference than the one drawn by Horizon. Furthermore, the Legislature's specific exclusion of medical expenses does not compel the conclusion that the Legislature intended to include *all* damages—even non-compensatory damages—within the cap. "The doctrine of *expressio unius est exclusio alterius* is simply an aid to determine legislative intent, not an absolute rule." *Mid–Century*

*Ins. Co. of Tex. v. Kidd,* 997 S.W.2d 265, 274 (Tex.1999).

In addition to article 4590i's legislative history and statements made by the TMA suggesting that punitive damages are not included in the cap, Texas Insurance Code article 5.15–1, section 8—passed during the same session as article 4590i—and its legislative history also point to the same conclusion. Article 5.15–1, section 8, provides that professional medical liability insurance policies cannot include coverage for punitive damages that may be assessed against a physician or health-care provider.[9] *See* TEX. INS.CODE art. 5.15–1, § 8. This provision made punitive damages uninsurable so that the intentional or grossly negligent wrongdoer would be penalized and hopefully deterred. *See* TEXAS MEDICAL PROFESSIONAL LIABILITY STUDY COMMISSION, FINAL REPORT TO THE 65th LEGISLATURE 25 (Dec.1976); *see also* Hearings on Tex. H.B. 722 Before the House Comm. on State Affairs, 65th Leg., R.S. (Feb. 14, 1977) (Rep. Davis's statement in reference to the proposed prohibition in the Insurance Code that "it's against social policy to permit someone to insure against their own gross negligence or a willful injury of another").

This statutory mandate coincides with article 4590i's underlying purpose, which is *to make insurance coverage affordable.* Defining damages in the statutory cap to include punitive damages would not have the effect of lowering insurance rates or increasing the availability of medical care in Texas since insurers · cannot insure against punitive damages anyway. *See* TEX. INS.CODE art. 5.15–1, § 8. A contrary conclusion that included punitive damages in the damages to be capped would not promote the purpose of article 4590i—to

9. Since article 5.15–1's enactment, for-profit nursing homes have been exempt from section 8's prohibition of insuring against punitive damages. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2054–56 (amending TEX. INS.CODE art. 5.15–1), *amended by* Act of June 3, 1987, 70th Leg., 1st C.S., ch.1, § 7.01, 1987 Tex. Gen. Laws 1, 36 (allowing hospitals to obtain an endorsement that would provide coverage for punitive damages), *amended by* Act of May 21, 1997, 75th Leg., R.S., ch.746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (allowing not-for-profit nursing homes to obtain coverage for punitive damages).

make insurance coverage affordable—and would conflict with the purposes of awarding punitive damages, which are to deter and punish culpable conduct.

■ In conclusion, the common-law meaning of damages is not readily ascertainable. However, article 4590i's legislative history leads to the conclusion that article 4590i does not cap punitive damages awarded in a health-care-liability claim. Therefore, the court of appeals properly affirmed the trial court's decision not to include punitive damages when capping part of Auld's damage award under article 4590i.

## B

### Section 41.007

■ The court of appeals held that section 41.007 of the Texas Civil Practice and Remedies Code capped the punitive damages awarded to Auld. 985 S.W.2d at 233. That provision—as it existed when Auld's cause of action accrued—provided that "exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, sec. 41.007, 1987 Tex. Gen. Laws 37, 46, *amended and renumbered by* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111. As a result, the court of appeals affirmed the trial court's reduction of punitive damages from $90,000,000 to $9,483,766.92 (four times the amount of Auld's uncapped actual damages). 985 S.W.2d at 234.

■ Auld challenges this holding and argues that the trial court was not authorized to reduce the jury's punitive damages award because (1) Horizon pleaded section 41.008 (the version of the statute effective beginning September 1, 1995) rather than section 41.007 (the previous

version that is applicable in this case),[10] and (2) Horizon did not plead any facts that would provide notice to Auld that Horizon intended to rely on section 41.007. Auld states that Horizon specifically pleaded the punitive-damages cap applicable to causes of action accruing on or after September 1, 1995 (section 41.008), and Hary's cause of action accrued prior to this date. Thus, Auld argues, section 41.007 cannot apply, and, as such, there should be no cap on her punitive damages award.

Auld is correct that Horizon's first amended original answer did not mention section 41.007. Instead, Horizon pleaded that sections 41.003 (regarding recovery of punitive damages), 41.008 (a revised and renumbered version of section 41.007 that did not become effective until after Hary's cause of action accrued), and 41.009 (regarding bifurcating the trial of the punitive damages issue) applied to this suit. Horizon's pleading stated: "Defendant affirmatively asserts and pleads that Plaintiff's claim for exemplary and punitive damages is controlled and limited by section 41.008 of the Texas Civil Practice and Remedies Code." Horizon also denied any allegations of "gross negligence, knowing conduct, intentional and wanton behavior, malice, and other conduct which may form the legal basis for entitlement to the exemplary or punitive damages requested by Plaintiff." Consequently, we must determine if the court of appeals erred in relying on section 41.007's capping provisions in light of Horizon's pleadings.

■ Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *See Broom v. Brookshire Bros., Inc.,* 923 S.W.2d 57, 60 (Tex.App.—Tyler 1995, writ denied). Ho-

---

**10.** The two statutes differ in their calculations of the maximum amount recoverable, and the newer version—section 41.008—renders the punitive damages cap wholly inapplicable to causes of action in which a party knowingly or intentionally violates one of fifteen enumerated criminal statutes.

rizon's first amended answer pleaded sufficient facts to give adequate and fair notice to Auld and the trial court of Horizon's intent to invoke the punitive-damages cap found in the Texas Civil Practice and Remedies Code, even though the pleading referred to an incorrect version of the statute. *See, e.g., CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 586 (Tex.App.—Dallas 1991, writ denied) ("A pleading that gives adequate notice will not fail merely because the draftsman named it improperly."). "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982). Horizon satisfied this standard. Being that there was, and is, only one punitive-damages cap provision in Chapter 41, it is hard to imagine that Auld was unaware of exactly what Horizon was claiming.

■■■■ In addition, Auld did not specially except to Horizon's misidentification of the applicable statutory provision. When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *See Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex.1993). An opposing party should use special exceptions to identify defects in a pleading so that they may be cured, if possible, by amendment. *See Cameron v. University of Houston*, 598 S.W.2d 344, 345 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.). Auld did not specially except to Horizon's pleading of the incorrect version of the statute; therefore, Horizon had no opportunity to correct it. Because we must construe Horizon's pleading in Horizon's favor, and because Horizon pleaded information specific enough to provide Auld with notice of its intent to rely on the punitive damages cap found in Chapter 41

11. The cap is adjusted when there is an increase or decrease in the consumer price in-

of the Texas Civil Practice and Remedies Code, we conclude that the court of appeals did not err in affirming the trial court's application of section 41.007.

## III

### Prejudgment Interest

■■■■ The trial court awarded prejudgment interest on the capped amount of actual damages, and the court of appeals affirmed, relying on former Texas Revised Civil Statute article 5069–1.05, section 6(a), which mandates that "judgments in wrongful death, personal injury, or property damage cases must include prejudgment interest." *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 51, *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now codified at TEX. FIN.CODE § 304.102). Horizon argues, however, that prejudgment interest should be included in article 4590i, section 11.02(a)'s cap because, at a minimum, section 11.02(a) caps all damages not specifically excluded by section 11.02(b), and section 11.02(b) does not exclude prejudgment interest from the cap. Horizon bases this argument on case law establishing prejudgment interest as a type of damages. *See, e.g., Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552–54 (Tex. 1985).

It is clear—from the language used in the statute and the legislative intent—that the Legislature placed an unequivocal limit on the amount that a health-care provider must pay in a final judgment under article 4590i. Section 11.02(a) states:

In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.[11]

dex. *See* TEX.REV.CIV. STAT. art. 4590i, § 11.04.

TEX.REV.CIV. STAT. art. 4590i, § 11.02(a). The Legislature expressly provided only one exception to that cap, section 11.02(b), which states:

> Subsection (a) of this section does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

*See id.* § 11.02(b).

■■■■■ Is prejudgment interest excepted from the cap? Obviously not. Is prejudgment interest included in the cap? Because section 11.02(a) mandates that the cap applies to a health-care provider's "civil liability for damages," the definition of that phrase governs the answer to the question. Section 1.03(b) directs that "[a]ny legal term or word of art used in this part, not otherwise defined in this part, shall have such meaning as is consistent with the common law." *See id.* § 1.03(b). Prejudgment interest falls within the common-law meaning of "damages." *See Cavnar,* 696 S.W.2d at 552–54. As such, section 11.02(a) mandates that prejudgment interest is subject to the cap.

Auld agrees that, after *Cavnar,* there is no question that the common law includes prejudgment interest as an element of damages recoverable in a personal-injury case but argues, nevertheless, that article 4590i's cap does not include prejudgment interest. Auld contends that prejudgment interest cannot be subject to the cap on damages because prejudgment interest was not recoverable in a personal-injury action in 1977, when article 4590i was first enacted. Prejudgment interest in personal-injury suits first became recoverable in 1985, when this Court decided *Cavnar.*

Auld argues that it is untenable to suggest that the Legislature intended to cap something that was not recoverable in health-care-liability claims when the Legislature originally passed article 4590i. Auld's contention suffers several flaws.

First, the conclusion that prejudgment interest is uncapped is contrary to the clear legislative intent of section 11.02(a) to cap all liability for "damages," as that term is defined in the common law, except for those medical expenses excepted from the cap in section 11.02(b). This intent has never been altered or diminished by the Legislature despite the fact that the Legislature has revisited and amended article 4590i on three occasions between the time *Cavnar* was issued and Auld filed her lawsuit. In 1989, 1991, and 1993, the Legislature amended various parts of 4590i.[12] This was on the heels of the 1987 legislative session during which the Legislature specifically considered the *Cavnar* decision and its implications. *See* SENATE COMM. ON STATE AFFAIRS, BILL ANALYSIS, Tex. S.B. 6, 70th Leg., 1st C.S. (1987) (discussing *Cavnar* and noting that "the Texas Supreme Court, in 1985, reviewed prior case law concerning the award of prejudgment interest ... [and] allowed prejudgment interest in personal injury cases and overruled all cases to the contrary"). Notably, and despite its express knowledge of *Cavnar* and that decision's impact on the common-law definition of damages, the Legislature made no change to section 11.02(a), 11.02(b), or 1.03(b).

■■■■ Second, Auld's contention pretends that the Legislature intended the phrase "[a]ny legal term ... shall have such meaning as is consistent with the common law" to lock in the common law as

**12.** *See* Act of May 26, 1989, 71st Leg., R.S., ch. 1027, § 27, sec. 14.01, 1989 Tex. Gen. Laws 4128, 4145; Act of May 26, 1989, 71st Leg., R.S., ch. 1027, § 28, sec. 7.02, 1989 Tex. Gen. Laws 4128, 4145; Act of Mar. 21, 1991, 72nd Leg., R.S., ch. 14, § 284(15), sec. 1.03(a)(5), 1991 Tex. Gen. Laws 42, 222; Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 2, sec. 41.02, 1993 Tex. Gen. Laws 2347, 2347; Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 3, sec. 13.01–.02, 1993 Tex. Gen. Laws 2347, 2347–48; Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 4, sec. 15.01, 1993 Tex. Gen. Laws 2347, 2349–50; Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 5, sec. 4.01, 1993 Tex. Gen. Laws 2347, 2350.

it existed in 1977. That contention is inconsistent with the inherent meaning of common law and would lead to anomalous results for the common law, for other statutes enacted by the Legislature, and, most relevant here, for article 4590i. As we noted in *Whittlesey v. Miller*, "[t]he law is not static; and the courts, whenever reason and equity demand, have been the primary instruments for changing the common law through a continual re-evaluation of common law concepts in light of current conditions." 572 S.W.2d 665, 668 (Tex.1978); *see also Reagan v. Vaughn*, 804 S.W.2d 463, 465–66 (Tex.1990) (" 'The common law is not frozen or stagnant, but evolving, and it is the duty of this court to recognize the evolution.' " (quoting *El Chico Corp. v. Poole*, 732 S.W.2d 306, 309–10 (Tex.1987))).

Since article 4590i's original enactment in 1977, this Court has recognized a number of new and different elements of common-law "damages" that are recoverable in personal-injury actions. *See, e.g., Krishnan v. Sepulveda*, 916 S.W.2d 478, 479–82 (Tex.1995) (recognizing for the first time that "parents may recover damages from the birth of a stillborn fetus resulting from injury to the mother caused by the allegedly negligent diagnosis, prenatal supervision and treatment of the mother by her physician"); *Reagan*, 804 S.W.2d at 467 (recognizing that a child may recover damages for loss of parental consortium when a third party causes a serious, permanent, and disabling injury to a parent); *Cavnar*, 696 S.W.2d at 551 (in addition to recognizing that a personal-injury plaintiff is entitled to prejudgment interest as an element of common-law damages, the Court recognized that a decedent's children in a wrongful-death case can recover damages for mental anguish and loss of companionship) (citing *Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex.1983)); and *Whittlesey*, 572 S.W.2d at 668 (recognizing a derivative claim for damages by a spouse for loss of consortium caused by a tortfeasor's negligently causing injury to other spouse). If section 1.03(b) froze the common law as it pertains to section 11.02(a), then the following anomaly would result: the newly recognized damages would not be capped because they were not recoverable in 1977. Stated differently, if prejudgment interest is not capped under section 11.02(a) because it did not exist as a form of common-law damages when article 4590i was originally enacted, then, similarly, the common-law damages recognized in *Krishnan*, *Reagan*, and *Cavnar*, as well as any other new common-law damages that may be recognized in the future, will be uncapped. That result obviously is contrary to the legislative intent and mandate of article 4590i.

*Auld* provides no support for the notion that the Legislature intended this result. Indeed, this result would be inconsistent with the express legislative intent behind article 4590i. If subsequently recognized common-law damages are not included within the scope of the cap, the cap is eviscerated for all practical purposes. Plaintiffs would obviously channel their damage claims to the uncapped areas, leading to the uncertainty, unpredictability, and uncapped damages that the Legislature sought to achieve by enacting article 4590i.

Moreover, *Auld's* position could compromise the Legislature's true intent with numerous other statutes that contain provisions similar to 1.03(b). *See, e.g.*, TEX.REV. CIV. STAT. art. 1396–2.22A(Q) ("A corporation may indemnify and advance expenses to an officer, employee, [or] agent . . . to such further extent, consistent with law, as may be provided by its articles of incorporation, bylaws, general or specific action of its board of directors, or contract or *as permitted or required by common law.*"); *id.* art. 6132a–1, § 11.17 ("A limited partnership may further indemnify and advance expenses to a limited partner, employee, [or] agent . . . to the extent, consistent with law, provided by its partnership agreement, by general or specific action of its general partner, by contract,

or *as permitted or required by common law*."); Tex. Gov't Code § 2007.002(4) (" *'Private real property' means an interest in real property recognized by common law* . . . . "); *id.* § 305.0011(e) ("The commission may adopt rules for the implementation of this section *consistent with this chapter, the Code of Professional Responsibility, and the common law of agency.*"); Tex. Prop.Code § 92.061 (noting that "this subchapter does not affect any other right of a landlord or tenant under contract, statutory law, or *common law* that is consistent with the purposes of this subchapter") (emphasis added in all).

To summarize, interpreting the section 11.02(a) cap to include prejudgment interest is "consistent with the common law" as dictated by section 1.03(b).

Next, Auld contends that if the section 11.02(a) cap on damages includes prejudgment interest, then that statutory provision conflicts with former article 5069–1.05, section 6(a), which provides that "a judgment in a wrongful death, personal injury, or property damage case must include prejudgment interest." [13] *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 51, *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now codified as Tex. Fin.Code § 304.102 with a change in language: "A judgment in a wrongful death, personal injury, or prop-

erty damage case earns prejudgment interest"). That conflict, Auld argues, must be resolved by awarding prejudgment interest under article 5069–1.05, even if it exceeds the cap. Despite these contentions, applying article 5069–1.05, section 6(a) to article 4590i claims without deferring to sections 11.02(a) or 1.03(b) produces a result inconsistent with legislative intent and statutory construction rules.

The purpose of article 4590i is to limit, not expand, a health-care provider's "civil liability for damages." *See, e.g.,* Tex.Rev. Civ. Stat. art. 4590i, § 1.02(b)(2) (stating that one of the purposes of article 4590i is to "decrease the cost of" health-care-liability claims); *id.* § 1.02(b)(4) (stating that another purpose of article 4590i is to make available to health-care providers insurance at "reasonably affordable rates"); *see also* Senate Comm. on State Affairs, Bill Analysis, Tex. S.B. 1409, 73rd Leg., R.S. (1993) (noting that article 4590i is intended to "reduce the expenses of *trying* medical liability lawsuits") (emphasis added). To clarify the uniqueness of the liability-limiting provisions of article 4590i and to ensure their distinction from other liability laws, the Legislature added section 1.02(b)(7) to the "Findings and Purposes" part of the Act. Section 1.02(b)(7) illustrates that one purpose of article 4590i is to modify "liability laws as they relate to health care liability claims only." *See* Tex. Rev.Civ. Stat. art. 4590i, § 1.02(b)(7).[14]

**13.** Separately, Auld contends that our interpretation of article 4590i, sections 1.03(b) and 11.02(a) poses a potential conflict with the recently enacted section 16 of article 4590i. Sections 16.01 and 16.02 provide:

Sec. 16.01. Notwithstanding [the mandatory prejudgment-interest statute in former article 5069–1.05], prejudgment interest in a health care liability claim shall be awarded in accordance with this subchapter.

Sec. 16.02. (a) In a health care liability claim, prejudgment interest may not be charged with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider.

(b) In a health care liability claim that is not settled within the period specified by

Subsection (a) of this section, the judgment must include prejudgment interest on past damages found by the trier of fact, but shall not include prejudgment interest on future damages found by the trier of fact.

Tex.Rev.Civ. Stat. art. 4590i, §§ 16.01, 16.02. Auld concedes that section 16.02 does not apply to her claim because Hary's cause of action accrued a few weeks before its enactment. *See id.* (effective for claims accruing on or after September 1, 1995). Because neither party disputes that section 16.02 does not apply in this case, it is unnecessary for us to decide this issue.

**14.** Section 1.02(b)(7) states:

Because of the conditions stated in Subsection (a) of this section, it is the purpose of this Act to improve and modify the system

This demonstrates that the Legislature understood that article 4590i is intended to limit liability in ways that are unique to 4590i and to be a self-contained structure for determining a health-care provider's liability and damages. Reading section 11.02(a) to prevail over article 5069–1.05 effectuates this legislative intent.

 This conclusion is consistent with the traditional statutory construction principle that the more specific statute controls over the more general. *See Lufkin v. City of Galveston*, 63 Tex. 437, 439 (1885); *see also Bala v. Maxwell*, 909 S.W.2d 889, 892 (Tex.1995) (holding that article 4590i, section 10.01 prevails over the conflicting general limitations statute); *cf.* TEX. GOV'T CODE § 311.026 (providing that, when construing code provisions that are irreconcilable, "the special or local provision prevails as an exception to the general provision"). With regard to the cap in article 4590i, section 11.02 and the general prejudgment-interest statute in article 5069–1.05, the former is the more specific statute in that it applies only to health-care liability claims, while the latter is more general because it applies to broader categories of claims, including all types of personal injury, property damage, and wrongful death. Thus, the cap in article 4590i prevails over the general prejudgment-interest statute.

This, of course, does not mean that article 5069–1.05, section 6(a) is wholly inapplicable in article 4590i cases. There will be many instances when the section 11.02(a) damages do not exceed—or even come close to—the cap. In those instances, article 5069–1.05, section 6(a) requires that prejudgment interest be added as damages up to the amount of the cap. Thus, the statutes can be harmonized to the extent that damages—including prejudgment interest—do not exceed the cap. By allow-

ing prejudgment interest up to the amount of the cap, the parties retain their rights under article 5069–1.05 while, at the same time, the stated purpose of section 11.02(a)—to limit a health-care provider's "civil liability for damages"—is fulfilled.

Finally, Auld also relies on *Rose v. Doctors Hospital*, in which the final judgment included a prejudgment-interest award exceeding the statutory cap. *See Rose v. Doctors Hosp.*, 801 S.W.2d 841 (Tex.1990). *Rose* involved a claim for wrongful death based on medical malpractice under article 4590i. *Rose*'s primary holding was that article 4590i's cap on damages could be constitutionally applied to a wrongful-death claim. *See id.* at 845–46. The Court did not analyze or discuss whether the cap included prejudgment interest yet included it in the judgment; therefore, *Rose* has no precedential effect on this issue.

In sum, Auld may recover prejudgment interest on those damages specifically excluded from the cap by section 11.02(b), but Auld may recover prejudgment interest on damages subject to the cap only up to the amount of the cap. Accordingly, that portion of the court of appeals' judgment affirming the trial court's award of prejudgment interest to Auld on damages subject to the cap is reversed to the extent it exceeds the cap.

## IV

### Constitutionality of Applying Article 4590i to a Survival Claim

 Auld asserts that the court of appeals erred in reducing her recovery because the cap in article 4590i does not apply to claims for a malpractice victim's personal injuries, citing *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988). In *Lucas* we held that article 4590i's cap on

---

by which health care liability claims are determined in order to: ... make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature to

not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law.

*See* TEX.REV.CIV. STAT. art. 4590i, § 1.02(b)(7).

damages was unconstitutional when applied to a common-law claim. *See id.* at 690. Auld argues that the cap's unconstitutional application to common-law personal-injury claims cannot be severed from its arguably constitutional application to survival claims, thereby rendering the cap void as to both types of personal injury claims. Horizon argues that Auld's complaint is an open-courts challenge, and, because she cannot satisfy the open-courts test, her constitutional arguments against the cap's application fail.

## A

### Severability

Auld urges that, even if her claim is statutory in nature and therefore not subject to an open-courts challenge, the unconstitutional application of the cap to a common-law claim for injury to a patient cannot be severed from the arguably constitutional application of the cap to the parallel statutory claim for injury to a patient; therefore, under *Lucas,* the entire cap is void. *Lucas*'s holding, however, was very limited and only invalidated that portion of the article 4590i cap applicable to a common-law medical-malpractice claim. *See Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex.1990).

■ In *Rose* we held that the severability clause in article 4590i enabled the Court to strike unconstitutional portions of the statute, such as the portion found unconstitutional in *Lucas,* while retaining valid portions. *See id.* (construing the statute's severability clause, found in Act of Aug. 29, 1977, ch. 817, § 41.04). "[I]f, when we strike the statute's application to the common law claims, we are left with something which 'remains complete in itself, and capable of being executed in accordance with the legislative intent, wholly independent of that which was rejected, it must stand.'" *Rose,* 801 S.W.2d at 845 (quoting *Western Union Tel. Co. v. State,* 62 Tex. 630, 634 (1884)). Under that test, we held that "[t]he application of [sections] 11.02 and 11.03 to wrongful death claims remains complete in itself, capable of execution in accord with the legislature's intent, and independent of any application to common law claims." *Id.* (noting also that "the open courts provision does not apply to statutory claims," and that the statute "may be validly applied to all but common law claims").

Using this test, we reach a similar conclusion with regard to Auld's survival claim. Because her survival claim is wholly statutory in nature—based on Texas Civil Practice and Remedies Code section 71.021—"[t]he application of [sections] 11.02 and 11.03 to [survival claims] remains complete in itself, capable of execution in accord with the legislature's intent, and independent of any application to common law claims." *Id.* This result is consistent with legislative intent since the Legislature expressly provided that the provisions of the subchapter containing the cap "shall apply notwithstanding the provisions in" the wrongful-death and survival statutes. *See* Tex.Rev.Civ. Stat. art. 4590i, § 11.05. Thus, application of the cap to common-law claims can be severed from application of the cap to statutory claims. The court of appeals did not err in affirming the trial court's application of the article 4590i cap to reduce a portion of Auld's damages.

## B

### Common-law versus Statutory Claims

■ Auld presents a second constitutional challenge to the cap based on our opinion in *Lucas,* which stated that, under the open-courts provision of the Texas Constitution, the cap in article 4590i could not be constitutionally applied to a common-law claim for personal injuries resulting from medical negligence. *See Lucas,* 757 S.W.2d at 690. Article I, section 13 guarantees that "[a]ll courts shall be open, and every person for any injury done him … shall have remedy by due course of law." Tex. Const. art. I, § 13. For this

provision to apply, however, the litigant must: (1) have a cognizable common-law cause of action that is being restricted; and (2) show that the restriction is unreasonable or arbitrary when balanced against the statute's purpose. *See Lucas,* 757 S.W.2d at 690 (quoting *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983)).

For Auld's argument to prevail, we must initially determine whether Auld's claim for Hary's personal injuries, although prosecuted under the survival statute, is cognizable as a common-law claim. As we stated in *Rose v. Doctors Hospital,* 801 S.W.2d 841, 845 (Tex.1990), all negligence actions are common-law claims. At common law, however, no personal injury cause of action survived a victim's death. *See Diaz v. Westphal,* 941 S.W.2d 96, 100 (Tex.1997); *Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 344–45 (Tex.1992). The victim's heirs could not sue on behalf of the victim or for their own losses due to the tortious act. *See Diaz,* 941 S.W.2d at 100. Because wrongful-death and survival actions would not exist absent legislative enactment, they are derived not from the common law but from a statute. *See* TEX. CIV. PRAC. & REM.CODE §§ 71.002, 71.004, 71.021; *see also Diaz,* 941 S.W.2d at 98, 101 (survival claim); *Rose,* 801 S.W.2d at 845 (wrongful-death claim). Auld argues that, although her claims may be statutory in nature today, when Hary first filed suit and when the negligence occurred, *Hary*'s claims were common-law, not statutory, claims; therefore, the common-law rights of those claims did not expire when Hary died. Auld finds support for this position in a recent appellate court opinion involving a survival action in which the court upheld an open-courts challenge to the limitations provision in article 4590i, section 10.01. *See Martin v. Catterson,* 981 S.W.2d 222 (Tex.App.—Houston [1 st Dist.] 1998), *pet. denied,* 2 S.W.3d 249 (Tex.1999) (per curiam). Although the *Catterson* court of appeals admitted that the survival claims were statutory at the time of appeal, the court noted that the claims were still common-law claims when the negligence occurred and when the suit was filed. *See id.* at 226. Thus, the court concluded that section 10.01 violated the open-courts provision and held that section 10.01 could not bar the plaintiff's survival action. *See id.*

We denied the petition for review in a per curiam opinion, stating that we "neither approve nor disapprove" of the court of appeals' conclusion that "'the claims were cognizable common-law causes of action when filed and at all times before Mr. Martin died[; therefore], we hold that the open courts doctrine applies and these claims are not barred by limitations.'" *Catterson,* 2 S.W.3d at 249 (quoting *Martin v. Catterson,* 981 S.W.2d at 226). By denying the petition in *Catterson,* we did not decide whether the court of appeals correctly applied the open-courts provision to a purely statutory claim. Our holding in *Bala v. Maxwell,* however, answers that question: wrongful-death and survival claimants cannot establish an open-courts violation because they "have no common law right to bring either." *See Bala v. Maxwell,* 909 S.W.2d 889, 893 (Tex.1995). The court of appeals in *Catterson,* therefore, misstated the law when it held that a statutory claim can withstand an open-courts challenge.[15]

We noted in *Bala* that a claimant in a common-law personal-injury action loses any right to recover on that claim when he dies. The representative of the decedent's estate may continue prosecuting the claim on the decedent's behalf; however, that right is statutory and not based in the common law. *See Bala,* 909 S.W.2d at 893 (the plaintiffs sued under both the survival and wrongful-death statutes but could not bring an open-courts challenge to the limitations provision in article 4590i because their claims were purely statutory); *cf. Baptist Mem'l Hosp. Sys. v. Arredondo,*

---

**15.** Because we denied the petition for review in *Catterson,* we express no opinion here concerning the other holdings of the court of appeals in that case.

922 S.W.2d 120, 121–22 (Tex.1996) (first prong of open-courts test was not satisfied by a wrongful-death plaintiff whose suit was based on medical malpractice because the claim was purely statutory). In other words, survival claims exist only because the Legislature provided for them. If the Legislature desires to provide survival claimants with the same rights as common-law claimants, the Legislature has the pre-rogative to do so. As the law stands now, though, survival claims are not derived from the common law and should not be treated by the courts as if they were.

Auld also argues that the survival statute precludes defenses against a survival plaintiff that could not have been asserted against the deceased plaintiff had she survived, citing *Vassallo v. Nederl–Amerik Stoomv Maats Holland,* 337 S.W.2d 309, 313 (Tex.Civ.App.—Eastland 1960), *aff'd in part, rev'd in part on other grounds,* 162 Tex. 52, 344 S.W.2d 421 (Tex.1961). Based on this premise, Auld asserts that *Vassallo* prevents Horizon from asserting an affirmative defense against Auld that it could not have asserted in the suit against the decedent, Martha Hary. In *Vassallo,* a longshoreman was killed while working on a vessel owned by one of the defendants. Although the defense of contributory negligence applied to the heirs' survival claim, the decedent's claim, had he survived, would have fallen under general maritime law and been subject only to comparative negligence, not contributory negligence. *See id.* at 311–12. The heirs argued that the survival statute provided them the same cause of action available to the decedent had he lived; therefore, the defendants were entitled only to those defenses they could have asserted against the decedent. *See id.* at 310–11. The court held that the heirs were entitled to recover whatever the decedent could have recovered had he survived; thus, the defendants could assert comparative negligence as a defense but not contributory negligence. *See id.* at 313.

Auld compares her claim to *Vassallo* and argues that because article 4590i's liability limitation is an affirmative defense that could not have been asserted against Hary, it may not be asserted against Auld. This argument might warrant further discussion had the Legislature not enacted section 11.05 along with the cap in section 11.02. Section 11.05 states that the "provisions of this subchapter shall apply notwithstanding the provisions" in the wrongful-death and survival statutes. *See* Tex. Rev.Civ. Stat. art. 4590i, § 11.05. The Legislature clearly intended the cap to apply to statutory survival claims notwithstanding the fact that the survival statute itself preserves the decedent's cause of action and the rights she possessed at the time of her death. Under the plain language of article 4590i, then, the cap can be pleaded and proved against Auld even though she is suing on Hary's behalf.

## V

### Horizon's Status as a "Health Care Provider"

Auld also challenges the cap's application to her claim by arguing that Horizon failed to conclusively prove or obtain a jury finding that it was a "health care provider" as defined in the statute. The court of appeals held that Auld's fourth amended petition alleging that her suit is a "health care liability claim," and that Horizon is a "nursing home" and a "health care provider" as those terms are defined in article 4590i, section 1.03(a), relieved Horizon of any burden to either plead its affirmative defense of entitlement to the article 4590i cap, to prove that defense, or ask for a jury finding on that defense.

Auld argues that because Horizon did not offer any evidence or obtain a jury finding that it was licensed or chartered by the State of Texas to provide health care to Hary during her residency at the nursing home, Horizon failed to meet the statute's definition of "health care provider." *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(3) (defining "health care provid-

er" as a "corporation ... duly licensed or chartered by the State of Texas to provide health care as a ... nursing home"). Even though Auld's pleadings referred to Horizon's negligent operation of the "nursing home," Auld disagrees with the court of appeals' "implied holding that claims against nursing home operators are 'health care liability claims' against 'health care providers,' regardless of whether the operator was licensed or chartered by the State." Horizon responds that Auld's judicial admissions and evidence at trial established Horizon's status as a health care provider under article 4590i, relieving Horizon of any burden to introduce evidence or obtain a jury finding that it was a health care provider under the statute.

 "A judicial admission must be a clear, deliberate, and unequivocal statement," *see Regency Advantage Ltd. Partnership v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex.1996), and "occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings or evidence unnecessary," *see Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 884 (Tex.App.—San Antonio 1996, writ denied). A judicial admission " 'not only relieves [an] adversary from making proof of the fact admitted but also bars the party himself from disputing it.' " *See id.* (quoting *Gevinson v. Manhattan Constr. Co.,* 449 S.W.2d 458, 466 (Tex.1969)). Once a fact is conclusively established by judicial admission, jury questions concerning the fact need not be submitted. *See id.* at 886.

 Auld's Fourth Amended Petition contained numerous clear and unequivocal assertions of fact constituting judicial admissions that Horizon (by owning and operating Heritage) was a "health care provider" and that Auld's claim was a "health care liability claim" as those terms are defined in article 4590i. For example, in that petition, she incorporated portions of Hary's original petition, including a state-

ment that Hary had complied with article 4590i's notice and expert-report provisions found in sections 4.01 and 13.01, respectively. Article 4590i requires the plaintiff to give presuit notice "to each health care provider against whom such claim is being made." TEX.REV.CIV. STAT. ANN. art. 4590i, § 4.01(a). The section 13.01 expert-report provisions apply to every "health care liability claim" and require the plaintiff to file an expert report for each defendant "health care provider." *See id.* § 13.01(a)(3). Certainly Hary's statements in her original petition alleging she had met the conditions precedent would not have been incorporated by reference into Auld's live pleading if Auld were avoiding the application of article 4590i to her case.

## VI

### Admissibility of the Survey Reports

 Horizon challenges the admission into evidence of the nursing-home-survey reports produced by the Texas Department of Human Services. These reports evidenced Horizon's staffing problems and its repeated failure to provide basic care to its residents, such as providing proper nutrition to and maintaining the personal hygiene of some of its residents. Horizon identifies two reasons why the reports' admission resulted in harmful error. First, the trial court admitted the surveys based on a statute that was ineffective at the time the claim accrued and that only applied prospectively. *Compare* TEX. HUMAN RESOURCES CODE § 32.021(i), (j)(as amended in 1997) (providing that survey reports are inadmissible for the purpose of proving that an institution committed a violation, but the prohibition does not bar their admission if offered to establish warning or notice to the institution of a relevant finding) *with* TEX. HUMAN RESOURCES CODE § 32.021(i), (j) (as enacted at the time Hary filed suit)[16] (providing that

---

**16.** See Act of May 26, 1995, 74th Leg., R.S., ch. 1049, § 1, 1995 Tex. Gen. Laws 5199, 5199 *amended by* Act of May 28, 1997, 75th

findings that an institution violated a standard for participation in the Medicaid program are not admissible to prove that the institution has committed a violation). Second, assuming arguendo that the 1997 version applied, the surveys were nevertheless inadmissible because they were not relevant to the standard of care; and, even if they were relevant, any relevance was substantially outweighed by the prejudicial impact of the reports. Auld counters that because Horizon did not request a limiting instruction at the time the trial court admitted the reports, Horizon waived any complaint concerning their admission. *See* Tex.R. Evid. 105(a); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex.1987).

▇▇▇ We review a trial court's evidentiary rulings for abuse of discretion. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling. *See id.* Texas Rule of Evidence 105(a) provides:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal.

Tex.R. Evid. 105(a). Horizon did not request a limiting instruction as to the general admission of the survey reports. Thus, if the survey reports were admissible by any party or for any purpose, the court of appeals did not err in affirming the trial court's admission of the reports. We therefore must determine whether the survey reports were admissible by any party or for any purpose.

Leg., R.S., ch. 1159, § 2.01, 1997 Tex. Gen.

We need not address whether Texas Human Resources Code section 32.021(j)(3) applies retroactively or whether the survey reports were admissible under that section because Horizon "opened the door" for the survey reports' admission into evidence. Horizon witnesses testified that the care provided to Hary was not inadequate because, if it had been, TDHS would have cited the nursing home for not rendering proper care. The following exchange occurred between Auld's counsel and one of Horizon's witnesses, Mary Ellen Posthauer:

Q: And you also—Mr. King asked you—I believe you stated an opinion that [Hary] was provided 1,000 calories a day.

A: She was provided more than 1,000 calories.

Q: Okay. And I assume you're talking your—that opinion is based on the medical chart?

A: That opinion is based on the standard regulations for nursing homes.

Q: Okay. So you're assuming, simply because there is a regulation, that the nursing home complied with the regulation?

A: Correct.

Q: Well, let's—But you really don't know, do you? You really don't know whether they did or not, do you?

A: They would be—*They would have been cited. By the nursing home standard, they would have had a deficiency had they not.*

Two other Horizon witnesses offered similar testimony. If the trial court did not allow the survey reports into evidence after Horizon's witnesses testified in this manner, the jury would be left with a false impression that Horizon had not been cited for rendering improper care when, in fact, it had.

▇▇ Finally, even if admitting the reports was erroneous, it cannot be said that

Laws 4363, 4387.

admitting them into evidence probably caused the rendition of an improper judgment. Auld presented evidence through expert medical testimony regarding the allegedly improper manner in which the nursing home treated Hary. The jury had sufficient evidence on which to base its verdict even disregarding the survey reports. And, Horizon presented controverting expert medical testimony that the nursing home provided adequate care to its residents, including Hary. Considering the entire record except for the survey reports, both sides presented evidence regarding how the nursing home treated Hary. Therefore, the reports probably did not cause the rendition of an improper judgment.

\* \* \* \* \*

In sum, we hold that article 4590i, section 11.02(a)'s cap on damages was not intended to and does not include punitive damages but does include prejudgment interest for cases in which article 4590i, section 16.02 does not apply. The cap in Texas Civil Practice and Remedies Code section 41.007 applies to Auld's punitive damage award. We agree with the court of appeals' conclusions with regard to the constitutional, procedural, and evidentiary matters raised by the parties. Accordingly, we affirm those parts of the court of appeals' judgment, but reverse and remand with regard to the prejudgment interest award on the damages subject to the cap.

Justice HANKINSON filed a concurring and dissenting opinion, in which Chief Justice PHILLIPS, Justice BAKER, and Justice O'NEILL joined.

Justice HANKINSON concurring and dissenting opinion, in which Chief Justice PHILLIPS, Justice BAKER, and Justice O'NEILL join.

I join the Court's opinion and judgment on all issues except prejudgment interest. As far as I can tell, at best all the Court has done is cap prejudgment interest from 1985 to 1995, for the few plaintiffs that may be left with unresolved claims whose injury was severe enough to cause non-medical damages exceeding the cap. At worst the Court creates an unnecessary conflict between article 4590i and article 5069–1.05, the prejudgment-interest statute, and an internal conflict between the article 4590i's cap and its new prejudgment-interest provision. I would hold that prejudgment interest is not subject to article 4590i's cap, and that in accord with the mandate of article 5069–1.05, section 6(a), Martha Hary's estate is entitled to its full and uncapped measure of prejudgment interest.

First, the Court's reading of article 4590i ignores the context and history of article 4590i and the prejudgment-interest statute. As the Court appears to agree, the Legislature could not have intended to include prejudgment interest in the cap on medical-malpractice damages when it enacted article 4590i in 1977 because at that time, prejudgment interest was not considered part of damages at common law. Prejudgment interest was not recoverable as damages in personal-injury actions until 1985, when this Court decided *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). Plainly the Legislature could not have intended to include in the cap an element of damages not recoverable at the time it enacted the cap. Likewise, our decision in *Cavnar* could not have changed the meaning of article 4590i, or in any way changed what the Legislature intended to include in the cap when it drafted article 4590i eight years before we decided *Cavnar*. Even if prejudgment interest were subject to the cap once it became available as common-law damages under *Cavnar* in 1985, the Legislature changed the law when it added section 6 to the prejudgment-interest statute in response to *Cavnar* two years later in 1987.

In article 5069–1.05, section 6, the Legislature mandated that all "[j]udgments in wrongful death, personal injury, and property damage cases must include prejudg-

ment interest." TEX.REV.CIV. STAT. ANN. art. 5069–1.05, § 6(a). The Legislature could not have made its directive more plain. *Judgments* in wrongful death, personal injury, and property damage cases *must include* prejudgment interest. The Legislature did not exempt judgments in medical-malpractice cases from this statute. It also did not express any intent to exempt medical-malpractice judgments or to cap prejudgment interest on medical-malpractice judgments when it amended article 4590i several times after enacting the prejudgment-interest statute. Indeed, the Court cites part of the legislative history of the prejudgment-interest statute, but then refuses to give effect to the statute's clear mandatory language.

My conclusion that prejudgment interest should not be capped is further supported by the Legislature's 1995 enactment of article 4590i, subchapter P, entitled "Prejudgment Interest," which mandates that a health-care liability judgment "must include prejudgment interest on past damages found by the trier of fact, but shall not include prejudgment interest on future damages found by the trier of fact." TEX. REV.CIV. STAT. ANN. art. 4590i, § 16.02. Although that section does not apply to this case because the claim at issue accrued before its enactment, that section does confirm that prejudgment interest is not subject to the cap or surely the Legislature would have mentioned or referred to the cap in that new subchapter. Moreover, in section 16.02, the Legislature specifically mandates prejudgment interest on past damages, but forbids it on future damages. TEX.REV.CIV. STAT. ANN. art. 4590i, § 16.02(b). This distinction further suggests that the Legislature did not intend to uncap previously capped prejudgment interest, but rather, working from the basis that prejudgment interest is fully available, determined to limit it to past damages. The Court's application of the cap in this case unnecessarily casts doubt on the provision's effect despite its clear language, and creates an inconsistency

within article 4590i despite the Legislature's apparent efforts at careful drafting.

The Court's view that my reading of the statutes somehow "freezes" the common law is incorrect. The Court cites cases permitting a mother to recover damages from the birth of a stillborn fetus and permitting plaintiffs in varying relationships to an injured person to recover for loss of consortium. None of the cases (other than *Cavnar*) were followed by the Legislature's enactment of a statute mandating awards of those kinds of damages. Moreover, these cases seem to recognize or extend types of claims, not establish new elements of common-law damages. My disagreement with the Court is not over whether prejudgment interest was subject to the cap as an element of common-law damages once *Cavnar* issued in 1985. My disagreement is with the Court's refusal to follow the mandatory language of the prejudgment-interest statute that governs this case.

Second, the Court's reliance on the canons of statutory construction is misplaced because they can be used to support either result in this case. While the Court concludes that article 4590i is more specific than the prejudgment-interest statute, one could just as easily argue that the prejudgment-interest statute is more specific because it mandates a specific type of interest on judgments for specific types of claims. Moreover, Government Code § 312.014(a) directs that if statutes "are irreconcilable, the statute latest in date of enactment prevails." TEX. GOV'T CODE § 312.014(a). The prejudgment-interest statute was enacted ten years after 4590i was enacted, and two years after prejudgment interest became available under *Cavnar*. Thus the canons of construction are of little help in resolving this case, and cannot outweigh the context and history of these statutes when attempting to divine and follow legislative intent. As Justice Frankfurter cautioned, canons of construction cannot "save us from the anguish of judgment. Such canons give an air of

abstract intellectual compulsion to what is in fact a delicate judgment, concluding a complicated process of balancing subtle and elusive elements." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 COLUM. L.REV. 527, 544 (1947). In this case, the Court sacrifices that balance in favor of rote recitation, while I would look to a larger frame of reference in an effort to reconcile the statutes for all claims and to comport with the legislative intent of both article 4590i and the prejudgment-interest statute.

If the statutes are reconciled as I propose, the Legislature's overriding goal of keeping health-care liability damages reasonably determinable and predictable in an effort to ameliorate the costs of the health-care system is still met. If one knows the amount of damages to be awarded under the cap and the prejudgment-interest rate, one can simply calculate the amount of prejudgment interest owed. Damages remain capped as dictated by article 4590i, section 11.02, but prejudgment interest can also be awarded as dictated by article 5069–1.05, section 6(a).

Finally, I must agree with Auld's counsel that the Court has in effect granted a third motion for rehearing in *Rose v. Doctors Hospital,* 801 S.W.2d 841 (Tex.1990). Prejudgment interest was awarded by the court of appeals in that case, and in its application for writ of error, the hospital's counsel, the same attorney who represents Horizon in this case, made the same argument that prejudgment interest had to be capped. The hospital explicitly repeated its argument that prejudgment interest had to be capped in its two motions for rehearing following this Court's opinions in *Rose.* Although the argument was not addressed by the Court in *Rose,* it was implicitly rejected by the Court's judgment that the plaintiffs "shall each recover from Doctors Hospital Facilities ... prejudgment and postjudgment interest thereon at the legal rate."

Thus, instead of harmonizing article 4590i and the prejudgment-interest statute so as to give effect to both, the Court's reading at best ignores the mandatory language of the prejudgment-interest statute and at worst creates an unnecessary conflict between that statute and article 4590i, and an internal conflict between article 4590i's cap and its new prejudgment-interest section. If prejudgment interest is not included in the cap, all parts of both statutes can be given full effect for all claims; actual damages remain capped under article 4590i, and prejudgment interest is awarded on the judgment, with no violence done to the Legislature's express purpose and language in article 4590i. Accordingly, I dissent from the Court's resolution of the prejudgment-interest issue.