Kimble Lynette LINCOLN, Individually, and as Representative of the Estate of Brian Gregory, Jr., Appellant,

v.

CLARK FREIGHT LINES, INC. and Juan Manuel Vasquez, Appellees.

No. 01–06–01177–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 12, 2009.

Benjamin L. Hall III, Elizabeth B. Hawkins, The Hall Law Firm, David W. Holman, The Holman Law Firm, P.C., Michael D. Hudgins, Nicole B. James, The Hudgins Law Firm, P.C., Houston, TX, for Appellant.

Teresa A. Carver, Walter F. 'Trey' Williams III, Brian T. Coolidge, Dan L. Fulkerson, Lorance & Thompson, P.C., Houston, TX, for Appellees.

Panel consists of Justices TAFT, KEYES, and ALCALA.

## OPINION

EVELYN V. KEYES, Justice.

In this negligence suit, appellant, Kimble Lynette Lincoln, Individually, and as Representative of the Estate of Brian Gregory, Jr. ("Lincoln") appeals the jury's verdict in favor of the appellees, Clark Freight Lines, Inc. and Juan Manuel Vasquez. In four issues, Lincoln argues that (1) the trial court abused its discretion when it allowed an expert to testify regarding an accident reconstruction that was substantially dissimilar to the actual collision; (2) the trial court abused its discretion when it allowed an expert to testify regarding an accident reconstruction that did not meet the reliability standards outlined in *Daubert*[1] and *Robinson*;[2] (3) the trial court abused its discretion when it allowed the jury to hear an expert's opinion that was unreliable; and (4) the trial court improperly denied a motion for mistrial when the verdict did not comport with the jurors' statements.

We affirm.

## Background

On October 9, 2004, Brian Gregory, Jr. was driving with his father, Brian Gregory, Sr., as a passenger in a 1989 Mustang. They stopped at a stop light at the intersection of the Westbound Service Road of the Sam Houston Parkway and the Northbound Service Road of the Hardy Toll Road ("Intersection A"). When the light turned green, Gregory, Sr., who was traveling west on the Service Road of the Sam Houston Parkway, drove toward the next light. At the intersection of the Southbound Service Road of the Hardy Toll Road and the Westbound Service Road of the Sam Houston parkway ("Intersection B"), the Mustang collided with a tractor-trailer driven by Juan Manuel Vasquez and owned and operated by Clark Freight Lines. Gregory, Jr. was killed.

Lincoln, Gregory, Jr.'s mother, sued Vasquez and Clark Freight Lines for negligence. She later amended her petition to include causes of action for negligence, gross negligence, violations of the Texas Wrongful Death Statute and Texas Survival Statute, principal-agent liability and negligent hiring, training and supervision.

---

1. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993).

2. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995).

Lincoln filed a *Daubert* motion to prevent Deputy D. Pearson, an accident reconstructionist with Harris County, from testifying about his accident reconstruction. At the pretrial *Daubert* hearing, Deputy Pearson[3] testified that he is assigned to the traffic enforcement division as an accident reconstructionist in the fatality accident reconstruction team. He has worked in this capacity for 23 years, attended several schools for accident reconstruction starting in 1988, and has over a thousand hours in accident reconstruction training. He testified that, using various tests, he could determine who proceeded through the red light at Intersection B, but to determine who caused the accident he would need to determine the coefficient of friction. Deputy Pearson testified that the coefficient of friction is a vehicle's "resistance to the tires sliding on a roadway surface once the vehicle's tires are locked and the vehicle is sliding on a level surface." He restated that "it's the deceleration rate for a vehicle, at what rate that vehicle will slow down, given the fact that the wheels are locked and sliding on a roadway surface." The trial court ruled that Deputy Pearson could testify about the coefficient of friction of the tires and causation.

At trial, Deputy Pearson testified, on the basis of the coefficient of friction, the time it took Gregory, Sr.'s vehicle to stop after application of the brakes locked the tires, and the timing of the lights, that Gregory, Sr. entered Intersection B on a red light and caused the accident. Lincoln's accident reconstruction expert, Richard Schlueter, testified on the basis of a similar coefficient of friction, the time it took Gregory, Sr. to stop, and the timing of the lights, that Vasquez entered Intersection B on a red light and caused the accident. The difference in their ultimate conclu-

sions derived from conflicting testimony as to how soon Gregory, Sr. sped forward after his light at Intersection A turned green. Deputy Pearson testified that eyewitnesses said the Mustang took off as soon as the light turned green. Gregory, Sr. testified that, once the light turned green, he did not accelerate right away. He testified that Gregory, Jr. told him that the light was green and then he accelerated.

Deputy R. Swango corroborated Deputy Pearson's testimony. Deputy Swango testified that he had over 700 hours of accident reconstruction training. He talked to two eyewitnesses, both of whom stated that the Mustang took off right away once the light at Intersection A turned green. He also testified that the Mustang could have taken off in less than a half second.

The jury found that the negligence of Gregory, Sr. was the sole proximate cause of the occurrence in question, and the trial court entered judgment that Lincoln take nothing. Lincoln filed a motion for new trial, which the trial court denied.

### Waiver

In this appeal, Lincoln argues that Deputy Pearson's coefficient of friction and causation testimony does not survive the *Daubert–Robinson* test for reliable expert testimony because his testimony was "based on an unreliable methodology, which drew conclusions from no scientific testing and only subjective 'eyeballing' of the tires." Appellees respond that the issue of the reliability of Deputy Pearson's expert testimony was waived because, after the trial court overruled Lincoln's *Daubert* objection, Lincoln called Deputy Pearson to testify without objection.

We disagree that Lincoln's complaints have been waived. When Lincoln's coun-

---

3. Deputy Pearson was not hired by either side for his testimony.

sel called Deputy Pearson as a witness, counsel specifically stated, "Your Honor, subject to the Court's prior rulings and without waiving the objection, we would call to the stand Deputy David Pearson." At this point in time, the trial court had already ruled that Deputy Pearson could opine on his coefficient of friction numbers and causation. Thus, we conclude that, by calling Deputy Pearson, Lincoln did not waive her objection to complain of the *Daubert* rulings on appeal.

## Expert Testimony

In issues one through three, Lincoln argues that Deputy Pearson's coefficient of friction analysis does not survive *Daubert–Robinson* because his testimony was "based on an unreliable methodology, which drew conclusions from no scientific testing and only subjective 'eyeballing' of the tires." Appellees respond that Deputy Pearson presented a sufficient basis to show that his testimony was reliable.

Texas has a long history of allowing qualified accident reconstruction experts to testify regarding the way in which an accident occurred. *See, e.g., Chavers v. State,* 991 S.W.2d 457, 460–61 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *Waring v. Wommack,* 945 S.W.2d 889, 893 (Tex.App.-Austin 1997, no writ); *Trailways, Inc. v. Clark,* 794 S.W.2d 479, 483 (Tex.App.-Corpus Christi 1990, writ denied); *DeLeon v. Louder,* 743 S.W.2d 357, 359 (Tex.App.-Amarillo 1987), *writ denied per curiam,* 754 S.W.2d 148 (Tex.1988); *Bolstad v. Egleson,* 326 S.W.2d 506, 519 (Tex.Civ.App.-Houston 1959, writ ref'd n.r.e.).

▪ Upon objection by the opponent of the evidence, the proponent of expert testimony has the burden to prove that the evidence is admissible. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995). A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified and (2) the testimony must be relevant and be based on a reliable foundation. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001). "Expert witnesses can have an extremely prejudicial impact on the jury, in part because of the way in which the jury perceives a witness labeled as an expert." *Robinson,* 923 S.W.2d at 553. The trial court is required to assess the reliability—not the truth or falsity—of the expert's opinion. *Id.* at 558. The testimony must be shown to be reliable before it is admitted. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998). That an expert is qualified does not mean that an opinion given by the expert is reliable. *Robinson,* 923 S.W.2d at 558. An expert "may be very believable but his or her conclusions may be based upon unreliable methodology." *Id.* The criteria for assessing reliability vary depending on the type of expert and the nature of the evidence. *Gammill,* 972 S.W.2d at 726–27; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). There must not be too great an analytical gap between the data or observations and the expert's conclusions. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997); *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 904–05 (Tex.2004). "Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than a 'subjective belief or unsupported speculation.'" *Gammill,* 972 S.W.2d at 720 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)).

▪ Unreliable scientific or technical evidence is of no assistance to the jury, and is therefore inadmissible under Rule 702 of the Texas Rules of Evidence. *Gammill,* 972 S.W.2d at 720. The trial court

may consider many factors in making the determination of admissibility under Rule 702. *Robinson*, 923 S.W.2d at 557. These factors include, but are not limited to: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.* at 557. If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). Furthermore, an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. *Id.*

▆▆▆▆ When an experiment is conducted out-of-court and in the absence of opposing counsel, there must be a substantial similarity between the conditions existing at the time of the experiment and the actual event that is the subject of litigation. *Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281–82 (Tex. 1964). However, the conditions do not need to be identical. *Id.* When there is dissimilarity in the conditions, the admission of the experiment is within the trial court's discretion if the differences are minor or are explained to the jury. *Id.* at 282. It is within the discretion of the trial court to determine whether the existence of a dissimilarity between those conditions causes evidence of the experiment to confuse rather than aid the jury and, thus, whether the evidence should be excluded. *Id.* at 282; *Sosa By and Through Grant v. Koshy*, 961 S.W.2d 420, 430 (Tex.App.-Houston [1st Dist.] 1997, pet. denied).

▆▆▆▆ The trial court has broad discretion in determining admissibility of an expert's testimony. *Robinson*, 923 S.W.2d at 556–57. We can reverse the district court's determination regarding admission of expert testimony only if the trial court abuses its discretion. *Id.* at 558. We analyze an alleged abuse of discretion by examining whether the trial court acted without reference to any guiding rules or principles. *See id.* We cannot find an abuse of discretion merely because we disagree with the trial court's decision. *See id.* And we will not reverse a trial court for an erroneous evidentiary ruling, including an evidentiary ruling regarding the admissibility of documentary evidence, unless the error probably caused the rendition of an improper judgment. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex.2000); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

### Reliability of Pearson's Testimony[4]

Lincoln has not contested Deputy Pearson's qualifications as an expert in accident

---

4. It is unclear whether Lincoln is also challenging the testimony of Deputy Swango, who also testified at trial. At the *Daubert* hearing, Lincoln never argued that Deputy Swango's testimony should be excluded or explained why the testimony should be excluded. In her brief, Lincoln makes a number of references to Deputy Swango's testimony in conjunction with Deputy Pearson's, but she never specifically states what portion of Deputy's

Swango's testimony should be excluded. Lincoln's brief states in a footnote, "To the extent that Deputy Swango relied on any of Deputy Pearsons' data and/or methodology, the Court should find Deputy Swango's opinions equally unreliable and scientifically invalid." Lincoln has provided no argument, has cited no authorities, and does not specifically state which portion of Deputy Swango's testimony should be excluded. Thus, we hold that Lincoln has

reconstruction. Rather, Lincoln argues that Deputy Pearson's testimony regarding who entered Intersection B on a red light and caused the accident is flawed because "the underlying data derived from the dissimilar vehicles renders Deputy Pearson's accident reconstruction unreliable" and "no scientific data [establishes] that the tires on the 2002 Camaro were similar to the tires on Gregory, Sr.'s car."

### Deputy Pearson's Testimony

At the *Daubert* hearing, Deputy Pearson testified that he is assigned to the traffic enforcement division as an accident reconstructionist on the fatality accident reconstruction team. He has worked in this capacity for 23 years, attended several schools for accident reconstruction starting in 1988, and has over a thousand hours in accident reconstruction training. Deputy Pearson testified that he could determine who entered Intersection B on a red light by knowing the time at which each light turned green, how far apart the lights were, the amount of time a vehicle was traveling, and the amount of time it took the vehicle to stop from the time the driver reacted. The amount of time to stop the vehicle is determined by calculating the coefficient of friction for the roadway traveled. He described the coefficient of friction as "resistance to the tires sliding on a roadway surface once the vehicle's tires are locked and the vehicle is sliding on a level surface." He restated that "it's the deceleration rate for a vehicle, at what rate that vehicle will slow down, given the fact that the wheels are locked and sliding on a roadway surface."

Pearson testified that there are three different ways to calculate the coefficient of friction for a particular roadway: (1) a skid test, (2) a drag sled,[5] and (3) a Vericom performance computer. Pearson stated that he used a Vericom computer to calculate the coefficient of friction. Pearson testified that the Vericom is an accepted way to determine the coefficient of friction. The coefficient of friction is "when you have a vehicle where all four tires are locked and not rotating any more and the vehicle is sliding on a level surface. The term drag factor is used when you have less than all four wheels locked and/or a surface that is not level." The Vericom uses drag factor to calculate the coefficient of friction. The Vericom measures the motion of the car and the amount of time it was moving. The computer uses accepted mathematical formulas to take data, and it calculates the drag factor once every 100th of a second while the vehicle is skidding. Ultimately, it takes the average of the drag factor throughout the entire skid. Pearson testified that with the known distance of the skid marks and the coefficient of friction he could determine the minimum speed of the vehicle at the beginning of the skid marks.

Pearson testified that, using the foregoing test, he could determine the acceleration rate of Gregory, Sr.'s vehicle because Gregory, Sr. started at a stopped position and traveled a known distance. He could also determine what speed Gregory, Sr. obtained up to the point at which he first started to react and how long it took to travel from a stopped position to the point where he first started to react. He could then use the acceleration rate, the distance the vehicle traveled, and the speed to determine how long it took in seconds to go

---

waived any complaint as to Deputy Swango's testimony. *See* TEX R. APP. P. 33.1. Moreover, the record does not reveal that Deputy Swango relied on Deputy Pearson's testimony.

5. Deputy Pearson acknowledged that when a drag sled is used to calculate the coefficient of friction no vehicles are used in conducting the test and that the drag sled has been accepted by accident reconstructions for many years.

from a stop to a point. Once he had the speed and knew the distance that the vehicle skidded, he testified, "[W]e can determine how long it took him to skid from where the skid marks start to where the impact with the vehicle was, and take those times to add up how long it was from the time he started from the stopped position to the point where he made impact with the trailer." Pearson testified that he performed an acceleration test with a Camaro to check his results because the Mustang was not driveable after the accident. But he determined the speed of the Mustang based on the information from the coefficient of friction,[6] not based on the Camaro's capabilities.

Pearson testified that the Northwestern Reconstruction Manual advises the use of a test skid to determine the drag factor. The manual instructs, "Duplicate as closely as possible the conditions under which the accident skid was made. It is best to use the same vehicle driven in the same direction at the same location and at approximately the same speed. If the accident vehicle cannot be used, another vehicle, for example, a police car, can be substituted. Usually this has little effect on the results." Pearson said that the "Northwestern Reconstruction Manual states that things such as temperature of the roadway, temperature outdoor, the heat friction, the weight of the passenger car [are] insignificant, that the only thing to be concerned with is that your road conditions are the same, you know, wet or dry, but that the tires are similar." The tires on both the Mustang and Camaro were soft rubber tires, not regular tires.

Pearson determined how long it took the Mustang to leave Intersection A after the

light changed to green by using "reaction time from the time he got a green light, and then again using some perception and reaction time." He also determined the reaction and perception times by using the Northwestern manual. Pearson ultimately concluded that, taking into account (1) a half-second reaction time at the light at Intersection A, (2) 6.07 seconds from the time that Gregory, Sr. left the green light at Intersection A to the time of the collision at Intersection B, and (3) the fact that the light at Intersection B turns green seven seconds after the light at Intersection A turns green, Gregory Sr. entered Intersection B on a red light.

### Lincoln's Arguments

Lincoln argues neither that Pearson's testimony on causation was junk science nor that the coefficient of friction method of determining the amount of time it took Gregory, Sr.'s vehicle to stop is not valid. Instead, Lincoln attacks the way in which Pearson calculated the coefficient of friction. First, Lincoln argues that, because Pearson used a Camaro, all of the opinions drawn from his calculations are flawed. Second, Lincoln argues that the coefficient of friction value that Pearson calculated is flawed because he did not use a durometer to compare the Mustang's tires with the Camaro's tires. We analyze these arguments in turn.

### Substantially Similar Vehicles

■ Lincoln first argues that the trial court erred in allowing Pearson's testimony because he did not use a substantially similar vehicle in reconstructing the accident.

Lincoln argues that

force goes up. Thus, it did not matter that the Camaro weighed more than the Mustang and was newer.

6. Deputy Pearson stated that "the coefficient of friction is the force that it takes to slide the object divided by the weight of the object." He explained that as the weight goes up, the

1. The police used a different year, make, and model vehicle to test its hypothesis in this case.

2. The police used an automatic transmission vehicle to perform its tests when the accident vehicle involved in the collision had a 5–speed manual transmission;

3. The police used a police "interceptor" camaro with a substantially more powerful engine to perform the skid and speed calculations, when no such forceful engine was involved in this case;

4. The police used a vehicle with a completely different braking system (all-wheel disc brakes) when the braking system involved in this case had two (2) disc brakes in the front and two (2) drum brakes in the rear;

. . .

7. At least one of the police skid tests was performed from a running and accelerating position (nonstop) when all evidence shows that Gregory, Sr.'s vehicle accelerated from a complete stop;

8. There is a weight difference between the respective vehicles of more than 600 pounds;

9. The police vehicle was only 2 years old at the time of the collision; while Gregory, Sr.'s vehicle was 15 years old (meaning different technology would have existed between the vehicles);

10. The police Camaro had a horsepower nearly 38% greater than the horsepower of Gregory, Sr.'s Mustang;

11. The suspension system between the police vehicle and Gregory, Sr.'s vehicle is completely different.

Pearson acknowledged that a number of differences existed between the Camaro and the Mustang, but he testified that the differences between the two vehicles had no effect on the coefficient of friction value. When asked if the year, make, and model of the vehicle were important in determining the coefficient of friction, Pearson answered "no," unless he was comparing a passenger vehicle with an 18–wheeler. He also stated that it did not matter that the Mustang had a manual transmission while the Camaro had an automatic transmission. The difference in braking system has no effect because "when we're talking about a drag factor for a vehicle that is skidding, the wheels are locked and sliding. We're not talking about how efficient or how quick the braking is because there's a difference between braking and skidding. We're talking about skidding. And once those wheels lock up, the efficiency of your brakes has nothing to do with it. If your wheels lock up and stay locked up, then that's all that matters." Pearson testified that neither the size of the engine nor the type of braking system would have an impact on his results.

Pearson also testified that a weight difference of 600 pounds would be insignificant in determining drag factor because "once the wheels are locked up and sliding, the weight of the vehicle . . . is immaterial. It's the friction between the tires and the roadway surface as the tires are sliding." He also testified that the difference in ages of the two vehicles, 15 years, was insignificant. He also testified that a difference of horsepower such as 33 percent greater would have no effect on drag factor.

Lincoln cites *Fort Worth & Denver Ry. Co. v. Williams* to show that the trial court should have excluded Pearson's testimony. *See* 375 S.W.2d 279 (Tex.1964). In *Williams,* an automobile-train collision caused the death of Williams. Fort Worth Railway introduced evidence of a motion picture film of an experiment made by

their attorney to show that a beam of light similar to the train's light would cause a "wall of light," obstructing the view of a person approaching the beam. *Id.* The court of civil appeals held that the admissibility of the experiment testimony was within the trial court's discretion because the dissimilarities between the experiment and the actual event were minor and could be explained to the jurors without confusing them. *Id.* at 282. The Texas Supreme Court reversed and remanded for a new trial. *Id.* at 284.

The *Williams* supreme court noted many differences between the motion picture and the actual event, which included the following: (1) the position of the lights and the distances in the experiment were not clear, and the distance of the actual event was 1,300 feet, not 600 to 700 feet as in the movie; (2) the only evidence of similarity of the scenes shown on the film and the actual appearance came from an interested non-expert witness; and (3) there was no evidence establishing the similarity of the motion picture's light's candlepower and the actual light's candlepower. *Id.* at 282–83. Taking all of these differences together, the court concluded that the experiment did not meet the requisites of admissibility. *Id.* at 283.

Here, unlike *Williams*, the dissimilarities between the Camaro and the Mustang were acknowledged by a neutral expert, Deputy Pearson, who explained why the differences did not affect the coefficient of friction value used to determine the time it took Gregory, Sr.'s vehicle to stop from his reaction point. The differences between the two vehicles and the reasons why the dissimilarities did not matter could easily be, and were, explained to the jury. *See Williams*, 375 S.W.2d at 282 (stating that trial court has discretion to admit experiment when dissimilarities are minor or can be made clear by explanation).

Lincoln also relies on *Mottu v. Navistar International Transportation Corp.*, 804 S.W.2d 144 (Tex.App.-Houston [14th Dist.] 1990, writ denied). *Mottu* involved a passenger vehicle colliding with a flatbed truck. At the time of the collision, the truck did not have an underride guard, which might have prevented cars from riding under the truck in the event of a rear-end collision. *Id.* at 146. At trial, the plaintiff sought to admit three videotapes of automobile crash tests depicting the effect of underride guards, but the trial court excluded the videotapes. The court of appeals held that the videotapes were cumulative of the expert's testimony, and thus the trial court did not err. The court further stated that the videotapes were not admissible because two of the tapes used cars manufactured in the late 1960's, whereas the plaintiff was riding in a 1977 Ford Thunderbird. The third film showed a Chevrolet Impala as the test vehicle, which the court noted had a different body style than the Thunderbird. *Id.* at 148. The court noted other differences, in that the truck was anchored and the angle of impact and the speed of the vehicles were all dissimilar to the actual accident. In effect, the court concluded that the videotapes were not substantially similar to the actual accident.

Just like *Williams*, *Mottu* involved a videotaped reconstruction, which is not at issue in the present case. Moreover, in an experiment attempting to show what would have happened in a rear-end collision if a truck underguard had been on the truck, some of the most relevant conditions of the experiment—including the type of car, year, angle of impact, and speed of the vehicle—were substantially dissimilar to the actual event. No testimony showed that these conditions were irrelevant to the matter to be shown, as in the present case.

We thus conclude that *Mottu* is inapposite to the facts of this case.

Here, unlike in *Williams* and *Mottu,* Deputy Pearson explained that the only relevant factor in using a second vehicle, the Camaro, to determine the coefficient of friction was the similarity of the Camaro's tires to the soft rubber tires on Gregory, Sr.'s Mustang. He further detailed all of the differences between the vehicles and explained why those differences did not matter in calculating the coefficient of friction. Although Pearson did not use the same vehicle that was involved in the collision to determine the coefficient of friction, the evidence revealed that the differences were explained and that the differences were immaterial and "readily understood." *Forth Worth & Denver Ry.,* 375 S.W.2d at 282. Thus, in light of the testimony and evidence before the trial court, we cannot conclude that the trial court abused its discretion in allowing Pearson's testimony.

### Similar Tires

■ Lincoln next argues that Pearson's underlying data and methodology were unreliable because he did not use a Durometer "to measure and compare the consistency of the tires," and therefore his opinions were also unreliable.[7]

Pearson admitted that a Durometer would have measured the hardness of the tires' rubber, but he testified that he did not have one at the time the accident reconstruction test was performed. Because he used a Camaro instead of Gregory's Sr.'s Mustang in determining the coefficient of friction, Pearson stated that he determined the hardness of the tire rubber between the Mustang and the Camaro by eyeballing the tires: "We eyeballed it. And we didn't guess, but we saw that the

tires were of a soft consistency." He admitted that eyeballing the tires was not scientific, but he testified that his scientific proof was "the testing that I have done involving similar tires that were involved in this crash, Mustangs, Camaros previously, which yield similar if not the same results." Pearson stated that the drag coefficient for the Camaro would be similar to, if not the same as, the drag coefficient for the Mustang. He drew this conclusion on the basis of his "experience in doing hundreds of tests with vehicles with soft rubber tires, regular passenger cars, harder truck tires, and finding the consistency in those tests that I did with similar tires."

Pearson chose the Camaro as a testing vehicle because it had "soft rubber tires consistent with the wide, slick tires that were on the Mustang, which also were—consisted of soft rubber." He said that it was important to use the Camaro because "[i]t gave me under the options I had the tires that were most consistent, the rubber hardness being that of what would be the same or very close to the same hardness as the vehicle that was involved in the crash because I wanted to determine a drag factor that was appropriate for the vehicle that was involved." Pearson testified that the tires on the Camaro were similar to the tires on the Mustang.

Pearson agreed that he did not use the accepted scientific methodology of the Durometer to test the similarity of the rubber between the Mustang's tires and the Camaro's tires, but he testified that his years of experience testing the coefficient of friction with "similar tires ..., Mustang Camaros previously, which yield similar if not the same results" supplied scientific proof

---

7. Lincoln also argues that Deputy Pearson "never indicated that he factored into the equation the age of the tires, the tread, or air pressure of the tires." Lincoln's specific complaint was not raised with the trial court. Thus, this portion of the issue has not been preserved. *See* Tex R. App. P. 33.1.

that the Camaro's drag coefficient would be similar to that of the Mustang. He also stated that the tires between the two cars were similar because "[t]he tires were both high-performance cars. For a sports car, they are both—you could see where both tires that were soft rubber compound. And there's physical evidence from everything that was done in this case that shows that these tires had the same coefficient of friction between the two tires based on the numbers we have in this reconstruction." He stated that his statement was not circular because he did not use one number to get the other. He also agreed that a difference in hardness of the tire rubber can affect the drag factor and ultimately affect the speed calculated from that factor, but he had not calculated if it would be an appreciable difference.

Pearson testified that he has presented the skid method of determining the coefficient of friction 15 to 20 times in criminal courts. He agreed that no one has ever challenged the tires before. In reaching his opinions, Pearson stated that he used generally accepted accident reconstruction methods that he was taught. He testified that the same methods were taught at Northwestern University, that Northwestern is the top place to go for schools, and professors at Northwestern are the "ones who wrote the book on accident reconstruction." Pearson disagreed that his testing was unreliable based on his experience in testing vehicles because both of the tires were high performance tires and "I could tell that both of these were soft rubber tires. And they would be very consistent in the drag factor that they would both come up with and would be reliable to use in this case."

Pearson's testimony shows that, in conducting his accident reconstruction, he performed a test that is widely used in the same field and it is generally accepted as being scientifically reliable. A part of Pearson's testing relied upon his subjective interpretation of the Mustang's tires as compared to the Camaro's tires. This factor though should be considered along with Pearson's extensive testing done with similar vehicles with similar tires. Pearson testified that his calculations were taught to him by Northwestern and that the tests have been published. No evidence was given on the technique's potential rate of error, but Pearson did admit that a difference in tire hardness could affect the calculation. No evidence was given on the technique's non-judicial uses. Although he did not use a Durometer to specifically measure the hardness of the Mustang's tires prior to trial to find substantially similar tires for the accident reconstruction,[8] Pearson testified that he used tires with the same consistency as the Mustang's tires.[9] He reached this conclusion based on his many years of experience as an expert in accident reconstruction, by performing hundreds of tests, working with the same tires in other tests, and actually looking at both sets of tires.

---

**8.** We note that the trial court allowed Deputy Pearson to conduct further tests on the tires mid-trial. Deputy Pearson used a Durometer on the Mustang's and the Camaro's tires and filed an affidavit in which he concluded that the tires were substantially similar. Lincoln objected to the mid-trial testing, and the trial court ruled that the affidavit and any testimony on the mid-trial testing were inadmissible. Although the jury did not hear evidence of the mid-trial testing, the trial court could have used this evidence in its decision to allow Deputy Pearson to testify regarding the coefficient of friction.

**9.** We note that Lincoln has cited no authority that a Durometer must be used in accident reconstruction. Even Lincoln's own expert testified, "typically, hardness values aren't brought into the mix when you're doing this type of analysis."

We conclude that Pearson's testimony regarding the coefficient of friction and causation was reliable in that it was grounded "in the methods and procedures of science" and was not based merely on "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)). Furthermore, his observation of enough tires to show a pattern is sufficient to support his opinion that the tires were of similar consistency. *See Gammill*, 972 S.W.2d at 726. We therefore hold that the trial court did not abuse its discretion in admitting the expert testimony of Pearson.

### Improper Verdict

■ Even if we concluded that the trial court erred in allowing Pearson to give expert testimony, Lincoln has not shown that this testimony led to an improper verdict. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 906.

The evidence shows that Lincoln's expert, Richard Schlueter, testified to calculating virtually the same numbers regarding the time from when the Mustang left Intersection A until the point of impact at Intersection B. Schlueter testified that the coefficient of friction for rubber on concrete was between .7 and .8. He got this number based on published scientific literature. He agreed that he did not put any kind of vehicle at the scene of the accident to try to determine what the "rubber on the tires reflected." Rather, he relied upon what scientists rely upon in the published literature. He calculated that, at the time Gregory, Sr. applied the brakes, he was traveling between 40 and 43 miles per hour. He testified that it took approximately 4.1 seconds to get from the stop

light to the time when Gregory Sr. applied his brakes.

When he totaled up the time from Intersection A to the collision, Schlueter got 6.25 seconds, as opposed to 6.57 seconds obtained by Pearson, but, importantly, Pearson's number included a half second of delay in waiting at the Intersection A light once the light turned green. Schlueter opined that Gregory, Sr. stayed at the light for at least two seconds after the light switched from red to green. Adding Schlueter's 6.25 seconds from the light to the collision site and the two seconds at the green light equals 8.25 seconds, meaning that Gregory, Sr. had a green light when he entered Intersection B. Schlueter also testified that Vasquez had a red light and that he did not slow down. Schlueter concluded that because Vasquez entered Intersection B on a red light, Vasquez caused the collision.

As noted by Lincoln's counsel during trial, the two experts had nearly identical calculations for the time it took Gregory, Sr. to travel from the green light at Intersection A to the point of impact at Intersection B, thus demonstrating that their coefficient of friction values were nearly the same. The only material difference in the experts' testimony that affected causation was the amount of time that Gregory, Sr. stayed at Intersection A after the light turned green.[10] Schlueter testified that he assumed that Gregory, Sr. left Intersection A around two seconds after the light turned green, and, based upon that number, Gregory, Sr. would have had a green light when he entered Intersection B. Pearson, however, testified that Gregory, Sr. left Intersection A a half-second after the light turned green, and based upon that number, Gregory, Sr. would have entered Intersection B on a red light.

---

10. At the *Daubert* hearing, Deputy Pearson testified that Gregory, Sr. would have had a

red light for .67 seconds before he entered the intersection.

Thus, even though Pearson's accident reconstruction did not use the same vehicle or a Durometer to check the tires, his expert opinion regarding the coefficient of friction had no bearing on causation— Pearson's ultimate conclusion that Gregory, Sr. entered Intersection B on a red light.[11] Pearson's testimony that Gregory, Sr. left Intersection A right away was not drawn from the methodology regarding the tires or the particular make of the vehicle. Stated another way, whether Pearson used a Durometer on the Mustang's and Camaro's tires had no bearing on Pearson's testimony that Gregory, Sr. accelerated as soon as the light turned green at Intersection A.

The jury heard conflicting evidence about the amount of time that it took for Gregory, Sr. to drive away from Intersection A. Deputies Pearson and Swango both testified that the eyewitnesses said that Gregory, Sr. left the light as soon as it turned green. Schlueter testified that he did not. Here, the jury was charged with determining whom it believed and resolving conflicting issues of fact. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). We may not substitute our opinion for that of the jury. *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex. App.-Houston [1st Dist.] 1993, writ denied). Accordingly, even if the trial court improperly allowed Pearson to testify regarding the coefficient of friction or causation, we cannot conclude that his testimony led to an improper verdict.

We overrule Lincoln's first, second, and third issues.

## Juror Confusion

 In her fourth issue, Lincoln argues that the trial court's instructions to the jury were "clearly not enough as evidenced by the jury's multiple questions."

During deliberations, the jury sent a note asking, "On Question No. 1, if we have one item with ten responding no and the other two items are unanimous, do the ten for that one item need to sign the last page? Do we designate which item had ten no's?" The trial court proposed to respond with, "Only those who agree to all of the answers should sign the certificate." Counsel for appellant and appellees had no objection to the trial court's response.

After the jury reached a verdict, the trial court polled the jury. Two of the jurors answered, "No," when asked whether the verdict was theirs. Because the charge of the court was signed by the jury foreman only (indicating that the verdict was unanimous), the trial court sent the jury back to the jury room. *See* TEX.R. CIV. P. 294. Counsel for Lincoln moved for a mistrial, which the trial court took under advisement.[12]

---

11. During cross-examination, Lincoln's counsel asked Deputy Pearson the following: "So, basically, the disagreement with you in terms of your reconstruction boils down to whether we accept your half second delay time versus at least two seconds at [Intersection] A. That's where it come[s] down to, doesn't it?

12. Although Lincoln indicates that the trial court denied the motion for mistrial, the record does not reflect that it ever ruled on the motion. Without a ruling on the motion for mistrial, we have nothing to review. *See* TEX. R.APP. P. 33.1. Even if the trial court denied the motion for mistrial, the trial court's decision was not an abuse of discretion in light of Rule 294. *See* TEX R. CIV. P. 294. Texas Rule of Civil Procedure 294 entitles a party to have the jury polled when the verdict is returned:

> Any party shall have the right to have the jury polled. A jury is polled by reading once to the jury collectively the general verdict, or the questions and answers thereto consecutively, and then calling the name of each juror separately and asking the juror if it is the juror's verdict. If any juror answers in the negative when the verdict is returned signed only by the presiding juror

After the trial court was back on the record, it instructed the jury to read the charge and to resume the deliberations. The trial court then read two questions that it had received from the jury. The first question stated, "We assume that the ten of us who agreed on all questions needed to sign the last page. We have done so. Is there anything else we need to do?" The trial court proposed to answer with the statement, "Once you have read and complied with all of the instructions in the Court's charge, you are to alert the bailiff." Counsel for appellant and appellees had no objection to this response.

The trial court stated that the jury's second question was, "Do we need to write something in each blank of the document?" The trial court's proposed response was, "Once you have read and complied with all of the instructions in the Court's charge, you are to alert the bailiff." Counsel for appellant and appellees both stated that they had no objection to the proposed response. The trial court then received another question from the jury as follows: "May I cross through my signature as presiding juror and initial it or would you prefer that we sign a new certificate?" The trial court proposed to respond with, "Please make sure the certificate conforms to your verdict." Again, none of the parties had an objection to the proposed response.

The jury returned to the courtroom a second time after reaching a verdict that had been signed by ten jurors. When the trial court polled the jury, two of the jurors stated that it was not their verdict. At no time did Lincoln argue that the jury was confused. Lincoln first argued that jury confusion led to an improper verdict in her motion for new trial.

Lincoln attempts to show juror confusion by relying on the affidavit of Catherine Tabberer. Tabberer, a paralegal, was assigned to poll the jurors. Based on post-trial discussions with 10 of the 12 jurors, she concluded:

> Each juror indicated that [D]eputy Pearson's testimony swayed their decision to find Brian Gregory, Sr. was solely liable for the accident made the basis of this lawsuit
>
> There was confusion as to how to answer issue # 1. It was thought that if an answer of "yes" was entered as to Brian Gregory, Sr., no additional person or entity could be indicated as having contributed to the accident.

■ To the extent that Lincoln argues that the trial court should have granted a new trial based on evidence obtained after the verdict was received and accepted, we conclude that Lincoln's argument has no merit. Juror testimony is limited to "whether any outside influence was improperly brought to bear upon any juror." TEX.R. CIV. P. 327(b); *see also* TEX.R. EVID. 606(b).[13] Under Rule 327(b), a juror may

as a unanimous verdict, or if any juror shown by the juror's signature to agree to the verdict should answer in the negative, the jury shall be retired for further deliberation.
TEX.R. CIV. P. 294.

13. Rule 606(b) provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2)

testify about "improper contacts with individuals outside the jury," or "matters or statements not occurring during the course of the jury's deliberations." *Golden Eagle,* 24 S.W.3d at 370. However, a juror "may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions...." Tex.R. Civ. P. 327(b); *see Golden Eagle,* 24 S.W.3d at 370.

Lincoln has not alleged any outside influence. Rather, she alleges that the jury was confused during deliberations. Lincoln's proffered affidavit is not proper evidence at a motion for new trial and could not be considered by the trial court. *See* Tex.R. Civ. P. 327(b) (stating that juror's affidavit "concerning matters about which he would be precluded from testifying" may not be received as evidence); *see also Kendall v. Whataburger, Inc.,* 759 S.W.2d 751, 755 (Tex.App.-Houston [1st Dist.] 1988, no writ) (stating that all testimony, affidavits, and other evidence is excluded from consideration by the court when an issue as to jury misconduct is raised unless outside influence is shown). We conclude that the trial court did not abuse its discretion in denying Lincoln's motion for new trial on this issue.

We overrule Lincoln's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

to rebut a claim that the juror was not qualified to serve.