In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-12-00189-CV
_____

### IN RE COMMITMENT OF RAYMOND LEE SMITH

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 11-08-08775-CV**

### MEMORANDUM OPINION

The State of Texas filed a petition to commit Raymond Lee Smith as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001-.151 (West 2010 & Supp. 2012). A jury found that Smith is a sexually violent predator, and the trial court signed a final judgment and order of civil commitment. In two appellate issues, Smith challenges the trial court's subject matter jurisdiction and the trial court's exclusion of testimony concerning the terms of his "Super Intensive Supervision Parole[.]" In a supplemental appellate issue, filed with permission of this Court, Smith asserts that the Texas Supreme Court's opinion in *In re Commitment of Bohannan*, No. 10-0605, 2012 WL 3800317 (Tex. Aug. 31, 2012) (not yet released for publication), rendered certain portions of Chapter 841 "facially unconstitutional and in violation of the Fourteenth

1

Amendment's due process clause." We affirm the trial court's judgment and order of civil commitment.

ISSUE ONE

In his first issue, Smith argues that the trial court lacked subject matter jurisdiction of the State's civil commitment petition because "the Legislature intended the civil commitment provisions of Chapter 841 of the Texas Health and Safety Code to apply only to an individual who has completed his sentence in its entirety, unlike Mr. Smith, who is to be released on parole." Smith asserts that because he is set to receive parole, which is a type of conditional release, his liberty will still be restrained, thereby removing him from the purview of Chapter 841. Finally, Smith also argues that his case "is not ripe for adjudication" because the potential injury to the State (*i.e.* that he will be in society without supervision) is neither direct nor immediate.

As this Court recently explained, the phrase "anticipated release date" is found in section 841.021. Tex. Health & Safety Code Ann. § 841.021 (West Supp. 2012); *In re Commitment of Evers*, ____ S.W.3d ____, No. 09-11-00430-CV, 2012 WL 6213508, at *1 (Tex. App.—Beaumont Dec. 13, 2012, pet. filed) (not yet released for publication). Section 841.022 creates a multidisciplinary team to review the records of a person referred to the team as a possible sexually violent predator under section 841.021. Tex. Health & Safety Code Ann. § 841.022 (West Supp. 2012); *Evers*, 2012 WL 6213508, at **1-2. "Section 841.021(c) provides that at least sixteen months before the person's

anticipated release date (barring exigent circumstances), TDCJ will give notice of that person's release to the multidisciplinary team so that the team can make certain specified assessments." *Evers*, 2012 WL 6213508 at *2.

As we explained in *Evers*, "[t]he statute does not distinguish between those anticipated to be released on parole and those anticipated to be released unconditionally as a result of completion of their sentences." *Id.* We rejected Evers's argument that the term "release" as used in the statute encompassed only those offenders who were to be released from prison because of completion of their sentences. *Id.* "[W]hen the Legislature adopts a provision that imposes a requirement but does not specify whether the failure to satisfy that requirement defeats the court's jurisdiction, a reviewing court presumes that the Legislature did not intend to make the provision jurisdictional." *Id.* at *3. "This presumption is overcome only by clear legislative intent to the contrary." *Id.* "Section 841.021 does not provide, or even suggest, that the provision is jurisdictional, nor does the statute specifically mandate that an anticipated release date is a prerequisite to suit." *Id.* We concluded in *Evers* that reading into the statutes an exception for individuals released on parole would not be consistent with the meaning of the applicable statutory provisions. *Id.* at *4.

Like the appellant in *Evers*, Smith raises a jurisdictional challenge based upon ripeness. As we explained in Evers, "the ripeness argument here has no merit. Whether the person is convicted of another offense after the State files a petition seeking civil

3

commitment, as was the case in *Robertson*, or whether a person is released on parole or released unconditionally, there is nothing in sections 841.021, .022, .023, or .041 that indicates the Legislature intended to divest the trial court of jurisdiction." *Id.* at *5 (citing *In re Commitment of Robertson*, No. 09-09-00307-CV, 2010 WL 3518509, at *13 (Tex. App.—Beaumont Sept. 9, 2010, pet. denied) (mem. op.)). For the same reasons set forth in *Evers*, we reject Smith's ripeness argument.

In its petition, which was filed in the 435th District Court in Montgomery County, the State alleged that Smith is "a sexually violent predator" and "a repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence." The petition listed Smith's three convictions for sexually violent offenses. The State's petition alleged facts that affirmatively demonstrated the trial court's subject matter jurisdiction. *See* Tex. Health & Safety Code Ann. § 841.041(a) (West 2010) (requiring that the State allege in its civil commitment petition that the person is a sexually violent predator, state facts sufficient to support that allegation, and file its petition "in a Montgomery County district court other than a family district court"). Because the trial court had subject matter jurisdiction over the commitment proceeding, we overrule issue one.

## ISSUE TWO

In his second issue, Smith argues that the trial court erred by excluding testimony regarding Smith's super intensive supervision parole plan after determining that such

4

testimony was irrelevant to the issue of whether Smith is likely to engage in a predatory act of sexual violence. Specifically, Smith complains that the trial court refused to allow Dr. Timothy Proctor, Dr. Michael Arambula, and Dr. Walter Quijano to testify concerning the terms of Smith's super intensive supervision parole plan and the effect of that level of supervision upon Smith's likelihood of engaging in a predatory act of sexual violence. Smith also argues that due process required that he be able to present such evidence. Citing *Kansas v. Hendricks,* 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), Smith contends that the trial court's ruling violated the Constitution because it did not require the jury to find that Smith was likely to engage in future acts of sexual violence.

"We review a trial court's evidentiary rulings for abuse of discretion." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *see In re Commitment of Salazar*, No. 09-07-345 CV, 2008 WL 4998273, at *2 (Tex. App.—Beaumont Nov. 26, 2008, pet. denied) (mem. op.). Error may not be predicated upon a ruling that excludes evidence unless the party's substantial rights are affected. Tex. R. Evid. 103(a). We will not reverse a judgment based on an error of law unless that error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the appellate court. Tex. R. App. P. 44.1(a).

5

Forensic psychologist Dr. Timothy Proctor, a witness for the State, testified that based on his education, training, experience, records he reviewed, and his interview with Smith, he determined that Smith suffers from a behavioral abnormality that makes him likely to commit predatory acts of sexual violence. Proctor identified Smith's history of juvenile offenses, as well as his non-sexual antisocial behavior, as significant in calculating Smith's risk for committing future criminal acts. Proctor testified that Smith committed two aggravated rapes, and Smith's mandatory supervision was revoked after he was charged with stalking.

Proctor diagnosed Smith with sexual sadism and antisocial personality disorder, and he testified that "it is a particularly dangerous combination to have those two diagnoses co-existing." Proctor also explained that both sexual sadism and antisocial personality disorder tend to persist throughout a person's life. Proctor testified that he administered the Hare Psychopathy Checklist and Static-99R to Smith. According to Proctor, Smith's score on the Static-99R placed Smith in the moderate/high range for risk of reoffending, and Smith's score on the Hare Psychopathy Checklist indicated that although Smith was not a psychopath, Smith had psychopathic characteristics "and his score is "relevant to his risk, but . . . not . . . an indication of psychopathy."

When asked during cross-examination whether very close supervision impacted Smith's behavior, Proctor testified that it had "some impact, but not the impact you would want" because Smith violated the terms of his mandatory supervision. The State

6

objected to the relevance of Smith's counsel's question about whether Smith had been approved for super intensive supervision parole. The State's counsel argued, "We're talking about his behavioral abnormality as it exists today . . . . What supervision he's going to be under and what level he's going to be under in the future is not relevant to the determination the jury has to make about a behavioral abnormality today." In response, Smith's counsel argued, "It goes to the likelihood of him reoffending. If he's under this intensive supervision, then it may be less likely that he is to reoffend in the future." The trial judge instructed the State's attorney to "[a]sk him that question[,]" Proctor testified, "I don't know. It would depend on what the restrictions were . . . ." When Smith's counsel asked Proctor what some of the restrictions were, the State objected on grounds that the answer constituted speculation, and the trial court sustained the State's objection. When Smith's counsel asked Proctor whether super intensive supervision parole is the most intensive type of parole available, the trial court sustained the State's objection.

Smith's counsel then took Proctor on voir dire to make a bill of exception. During the voir dire examination, Proctor testified that Smith had been approved for super intensive supervision parole, which would require Smith to submit to additional sex offender treatment, monitoring, and substance abuse treatment, as well as register as a sex offender. According to Proctor, the parole panel could modify or remove conditions of Smith's supervision. Proctor explained that Smith was scheduled to be under supervision until 2032. After Smith's counsel concluded the bill, the trial court questioned counsel

7

regarding the relevance of the proposed questions to whether Smith suffers from a present behavioral abnormality.

The trial court concluded as follows:

> THE COURT: Counsel, either he has the acquired or congenital condition today or he doesn't. If he has it today, it's an acquired or congenital condition that makes him likely to engage in future . . . predatory acts of sexual violence. And that's a condition that exists right now. And what treatment he gets tomorrow or on parole is not relevant to his condition today. Or if it is, kindly explain how.
> . . .
>
> And it looks to me as though the Legislature, in crafting Chapter 841, did it with very precise terminology that says it's his condition today that matters, not what treatment's going to happen in the future.
>
> State's witness Dr. Michael Arambula, a forensic psychiatrist, testified that using

the DSM-IV, his diagnoses of Smith are "paraphilia, not otherwise specified, with

sadistic features and antisocial personality disorder[.]" According to Arambula, those

two diagnoses

> are the largest risk factors for recidivism in the literature that have existed for years and years. When you put those two together, you have somebody . . . who has sexual deviance. In other words, they are not thinking right when it comes to sex. And then they have a disregard for the laws of the community and disregard for others. So when you put those two together, it's trouble.

According to Arambula, the severity of Smith's sexual deviancy and Smith's risk factors

are "what rises [sic] him to the level of behavioral abnormality." Arambula explained

that "sexual deviance is a condition of chronicity, so [Smith] will have it the rest of his

life." Arambula testified that "[e]ven when [Smith] was on supervision, he didn't

8

behave. So the structure of prison is a good thing." Arambula opined that Smith has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence, and he explained that his determination of Smith's behavioral abnormality is based on the past.

When Smith's counsel asked Arambula whether his risk assessment included "looking into future dangerousness[,]" counsel for the State objected on relevance grounds. Smith's counsel rephrased his question and asked Arambula whether he could predict the future, to which Arambula responded, "No." Upon being asked by Smith's counsel if he understood that Smith would be under treatment upon his release, Arambula testified, "I can only speculate." Smith's counsel asked, "if Mr. Smith were to be under treatment, that would lower his risk in your opinion[,]" and the trial court sustained the State's objection that the answer would constitute speculation. When Smith's counsel rephrased the question, Arambula testified that treatment would lower Smith's risk.

At the conclusion of Arambula's testimony, Smith's counsel made a bill of exception outside the presence of the jury. Arambula explained during voir dire examination that he assumed that Smith will be under supervision upon his release. Arambula stated that treatment is discussed in the records he reviewed, but he does not know how it will be applied to Smith individually. Arambula testified, "I was just trying to evaluate whether he had a behavioral abnormality or not, and that was it." Arambula also explained that he would be willing to review Smith's deposition and other records

9

"to see what kind of impact treatment might have which could affect my opinion. But . . .

it would just be speculation." During argument on the bill of exception, the following

colloquy occurred:

> [Smith's counsel]: . . . I would just say that I think Dr. Arambula's testimony suggested that future treatment, future supervision are issues that affect his opinion and that the fact finders in this case are entitled to at least entertain it and give it their own weight.
> THE COURT: Response?
> [State's counsel]: Your Honor, I still believe at this time it's speculation. They're looking at what may happen in the future, and the doctor's not able to testify on what may happen and basing that on the behavioral abnormality as it exists today. . . .
>
> THE COURT: But, . . . Chapter 841 where it says in 841.002(b) defining behavioral abnormality as a congenital, which I believe means that it came with birth, or acquired, which is in the past tense, condition. And either your client has that condition today or not. The testimony of Dr. Arambula, as well as Dr. Proctor, is that in his opinion he's got that condition today.
>     Now, tomorrow is unrelated to it unless your expert says that tomorrow he doesn't have that condition. And your expert may say that. But certainly, once he's released from prison cannot impact, as I see it, on whether or not today and tomorrow or during this trial your client has a congenital or acquired condition. I think that's kind of the way we looked at it earlier – at least the way I looked at it. Where do I err?
> [Smith's counsel]: . . . I believe that the definition goes on to say that he must be likely . . . to engage in a predatory act of sexual violence.
> THE COURT: But that's because of the condition today saying that he's likely to engage . . . in a predatory act of sexual violence. Now, of course, he's been in prison. We can't really know his current circumstance. That's why we rely on experts to tell us if he has this congenital or acquired condition that makes him a menace to the health and safety of another person and likely to engage in a predatory act of sexual violence. Now, the Supreme Court, I believe, has said, and the Court of Appeals has said, that this is not three different bites. This is one condition. And having said that, it would appear to me, at least, if one is to rely on what the Appellate Courts say, that the condition your client has according to the experts that have testified . . . that he has that congenital or acquired condition that

makes him likely to do these things in the future. And that's as close as we can come to predicting the future and whether he's going to be treated on outpatient or in-patient circumstances after he's released from prison or whether he's committed by the Court after a decision by the jury in this case . . . as I see it is simply unrelated and irrelevant to whether or not he's got the condition today. And explain to me where I err.

[Smith's counsel]: Well, Your Honor, if I can point out one more thing. Going back to Dr. Proctor's earlier testimony, he runs these actuarial tests, the Static-99R specifically in this case, which specifically looks at future risk of reoffending and even assigns statistical probabilities for people with the same score as Mr. Smith. So I think that it's part of the picture the fact finders should look at is future risk to reoffend. Is he likely to engage in these acts again when he's . . . released from prison?

THE COURT: Then we've got to pick the statute apart and submit questions on each element here, which I know y'all have always felt ought to be done because that gives you more chances to get one "no" answer and vitiate the trial. The problem, of course, is that's not what the statute says. That's not what the Court of Appeals says, and that's not what the Supreme Court of Texas says. And I kind of thought we ought to go with those Appellate Courts rather than our own independent feelings. You know, we can reinvent the wheel if we choose to, but a round wheel is probably better than a square or hexagonal wheel. So, it appears to me that we better go with what the law seems to be. And it seems to me that it's a whole bundle of things.

Now, you talk about the instruments used by the mental health experts that testify, but those are just instruments that they use in forming their opinion. They are not the ultimate basis for the opinion. At least the testimony I remember hearing is that their opinion is based on a whole bundle of things. In part, the hearsay evidence that is presented in the pen packets, the answers of your client, the personal evaluation of your client by the experts. And then they form an opinion. And we've had two witnesses proferred as experts that say in their opinion he has this behavioral abnormality. And that's as of today. And I believe both of them pretty well said they just can't predict the future about what's going to happen because it's not unlike the admonition given to a criminal jury that they may consider there's such a thing as good time and such a thing as parole, but because those decisions are made by third parties over which the Court has no control, they cannot take that into consideration when they assess punishment. That's different, of course, because it's a criminal trial, but it is similar to the circumstances here in my view and the reason why

11

we don't get into the question of treatment either by the parole board, treatment by some third party or treatment . . . of someone that is committed by a treatment provider. It's just not something we can address today because we don't know what's going to happen. And, again, it is difficult to predict things, especially if they deal with the future. So, . . . I know you feel committed to your position . . ., and I commend you for that. . . . But I believe I'm correct. I believe that's what all the case law has said. And I believe that is where we are in the trial of Chapter 841 cases.

So, I most respectfully note your exception to what you believe is an obviously wrong ruling on the Court's part.

Smith also called his own expert witness, clinical and forensic psychologist Dr. Walter Quijano, to testify concerning whether Smith has a behavioral abnormality as defined by the statute. Quijano testified that he diagnosed Smith with "sexual assault of adult, sexual assault of a child, substance abuse, . . . and antisocial personality[,]" but he opined that Smith does not have a behavioral abnormality "at this time." Quijano testified, "I did not see any defect in the emotional capacity as the statute requires us to answer. I did not see any defect in the volitional capacity as the statute requires us to answer."

When asked why he first determines whether a behavioral abnormality exists and then determines whether an individual is likely to reoffend, Quijano testified, "If the judgment is he has no behavioral abnormality, then the question of likelihood of reoffending only becomes a treatment issue and management issue. So, once the judgment is made that he has no behavioral abnormality, the second question is how should he be managed, civil commitment, intense supervision." Counsel for the State objected to the testimony on grounds of relevance because "[w]e're talking about his risk

12

today." The Court responded, "The only issue is whether or not your client has a behavioral abnormality as defined in Chapter 841. And as we've discussed twice, that is a condition either existing or not as of today. What happens tomorrow is not relevant." When Quijano subsequently testified with respect to Smith's positive factors that Smith "has a plan to leave TDC[,]" counsel for the State objected.

After Quijano's testimony concluded, Smith's counsel took Quijano on voir dire. During voir dire, Quijano stated that if a person were on parole, the more structured conditions would lessen the person's probability of reoffending. Quijano indicated that Smith "was accepted to intensive supervision parole[,] which is a lot more structured than the ordinary parole." According to Quijano, Smith would be subject to additional sex offender treatment, GPS monitoring, travel restrictions, would not be permitted to be with children unsupervised, and would have to comply with "a host of other conditions." Quijano opined that Smith "will be discharged under a parole plan that is very, very structured, and that parole plan has a very good low recidivism rate." In addition, Quijano stated that super intensive supervision parole is superior to civil commitment because "the treatment happens in the real world, not in a halfway house setting."

Relevant evidence is any evidence that tends to make a fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. Pursuant to the SVP statute, the issue to be determined by the jury was whether Smith is a repeat sexually violent offender and suffers from a behavioral abnormality that makes him likely

13

to commit a predatory act of sexual violence. Tex. Health & Safety Code Ann. § 841.003(a) (West 2010). The relevant inquiry is whether Smith's behavioral abnormality makes him likely to commit a predatory act of sexual violence. *See id*. Therefore, the level of supervision to which Smith would be subject if placed on super intensive supervision parole is not relevant to the issue before the jury, and the trial court did not abuse its discretion by refusing to admit evidence concerning the conditions of super intensive supervision parole. *See generally Auld*, 34 S.W.3d at 906; *Salazar*, 2008 WL 4998273, at *2.

Even if the trial court had erred by excluding the evidence, Smith must demonstrate that the trial court's decision probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a). The jury heard evidence concerning Smith's prior offenses, his diagnoses of sexual sadism, sexual deviance, and antisocial personality disorder, and his scores on actuarials, which indicated Smith's risk of reoffending was moderate to high. The jury also heard evidence that Smith had been previously unable to comply with the terms of supervised release. In light of the totality of the evidence before the jury, we conclude that Smith has not demonstrated that the trial court's decision not to admit evidence concerning the terms of his super intensive supervision parole probably caused the rendition of an improper judgment. *See id*. We overrule issue two.

14

## SUPPLEMENTAL ISSUE

In a supplemental issue, Smith argues that the Texas Supreme Court's decision in *In re Commitment of Bohannan*, No. 10-0605, ___ S.W.3d ___, 2012 WL 3800317 (Tex. Aug. 31, 2012) (not yet released for publication) interpreted portions of the SVP statute in such a way as to violate due process and render the statute facially unconstitutional. He contends that *Bohannan* dispenses with the "mental condition" and "serious difficulty controlling behavior" language found in sections 841.002(2) and 841.003(a)(2) and permits civil commitment based solely on a predisposition to violence.

In *Bohannan*, the Texas Supreme Court considered the qualifications that an expert must have to testify to whether a person is a sexually violent predator and subject to civil commitment. *Bohannan*, 2012 WL 3800317, at *1. In doing so, the Court explained that a behavioral abnormality is a condition that predisposes sexually violent conduct and that "predisposes" merely qualifies and describes "condition." *Id*. at *4. Thus, according to the Court, a "behavioral abnormality" might more clearly be defined as "a congenital or acquired predisposition, due to one's emotional or volitional capacity, to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*.

The Court also addressed the terms "likelihood" and "predisposition" as follows:

> A person is a sexually violent predator . . . if the person . . . suffers from [a congenital or acquired condition

{Qualifier A} that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person]

{Qualifier B} that makes the person likely to engage in a predatory act of sexual violence.

*Id.* at \*5. According to the Court, Qualifier B merely explains or restates Qualifier A and is not a separate element of a "behavioral abnormality." *Id.* The Court explained that the import of both "likelihood" and "predisposition" is "increased risk;" *i.e.*, "increased likelihood of misconduct indicates a predisposition, and a predisposition threatens increased likelihood." *Id.* The Court concluded that "whether a person 'suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence' is a single, unified issue." *Id.*

Additionally, the Court noted that the SVP statute is intended to "reduce the risk of those who are behaviorally predisposed to sexually violent conduct." *Id.* at \*7. According to the Court, the only fact issue in an SVP proceeding is whether a person has the behavioral abnormality required for an SVP. *Id.* Thus, the "principal issue in a commitment proceeding is not a person's mental health but whether he is predisposed to sexually violent conduct." *Id.*

As we recently explained, "*Bohannan* did not eliminate any proof required by the statute for a sexually-violent-predator finding, nor did the Supreme Court change the statute or render it unconstitutional." *In re Commitment of Anderson*, ____ S.W.3d ____,

16

No. 09-11-00613-CV, 2013 WL 257162, at *7 (Tex. App.—Beaumont Jan. 24, 2013, no pet. h.) (not yet released for publication). Both this Court and the Third Court of Appeals "have addressed arguments similar to those made by appellant, and noted that serious difficulty controlling behavior is embedded in the definition of 'behavioral abnormality.'" *Id.* (citing *In re Commitment of Almaguer*, 117 S.W.3d 500, 502-507 (Tex. App.—Beaumont 2003, pet. denied) and *In re Commitment of Browning*, 113 S.W.3d 851, 862-63 (Tex. App.—Austin 2003, pet. denied)). In *Anderson*, we explained that "[a]n affirmative answer to the question of whether a person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence necessarily entails a determination that he has serious difficulty controlling behavior." *Id.* For the same reasons set forth in *Anderson*, we conclude that *Bohannan* neither eliminated a statutory requirement nor altered the proof required under the statute to find that a person is a sexually violent predator. *See id.* at **7-8. Accordingly, we overrule Smith's issue and affirm the trial court's judgment and order of civil commitment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on October 23, 2012
Opinion Delivered February 7, 2013
Before McKeithen, C.J., Kreger and Horton, JJ.